In the Matter of The Complaint of POTOMAC TRANSPORT INC., as Owner of S/S POTOMAC, for Exoneration from or Limitation of Liability.

BANGLADESH SHIPPING CORPORATION, Plaintiff,

v.

OMI CORP., Defendant.

Nos. 82 Civ. 0805 (JFK), 83 Civ. 4597 (JFK).

United States District Court, S.D. New York.

Nov. 29, 1989.

Burlingham Underwood & Lord, New York City (Joseph C. Smith, W. Thaddeus Miller, Frank A. Atcheson, of counsel), for plaintiff Potomac Transport Inc. and defendant OMI Corp.

Walker & Corsa, New York City (Christopher H. Mansuy, of counsel), for plaintiff Bangladesh Shipping Corp.

Waesche, Sheinbaum & O'Regan, P.C., New York City (Richard W. Stone, II, of counsel), for Cargo claimants.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

KEENAN, District Judge:

### PROCEDURAL BACKGROUND

These actions arise out of the February 8, 1982 collision between S/S POTOMAC ("POTOMAC") and M/V BANGLAR BAANI ("BAANI") in the Gulf of Mexico west of the Florida Keys.

Action 82–805 was commenced on February 9, 1982 and is a limitation of liability proceeding in which POTOMAC TRANSPORT INC. ("POTOMAC TRANSPORT"), registered owner of POTOMAC, seeks exoneration from or limitation of liability for any loss or damage arising out of the collision pursuant to 46 U.S.C.App. §§ 183–189.

BANGLADESH SHIPPING CORP. ("BSC"), owner and operator of the BAANI, filed an Answer to the Complaint and a Claim against POTOMAC TRANSPORT on April 2, 1982. On April 14, 1982, POTOMAC TRANSPORT filed a Counterclaim against BSC. On May 5, 1982, BSC Answered the Counterclaim, and on May 19, 1982, BSC filed an Amended Answer to the Counterclaim. On May 28, 1982, Royal Insurance Company, et al. ("cargo claimants"), filed an Answer to the Complaint and a Claim for damages suffered by cargo interests for cargo aboard BANGLAR BAANI. Cargo claimants filed a Cross–Claim against BSC on February 3, 1983.

On June 21, 1983, BSC commenced action 83–4597 against Ogden Marine Inc. (now known as OMI Corp. ("OMI")), as manager and operator of POTOMAC, seeking to recover the same damages sought in BSC's Claim against POTOMAC TRANSPORT in the limitation proceeding. OMI filed its Answer on October 31, 1983.

### JURISDICTION—VENUE

This is a case of admiralty and maritime jurisdiction pursuant to Title 28 U.S.C. § 1333 and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for the United States District Courts. There is no dispute concerning jurisdiction or venue in the United States District Court for the Southern District of New York.

### TESTIMONY AND FACTUAL FINDINGS

On the early morning of February 8, 1982 several miles west of the Florida Keys in open seas in the Gulf of Mexico under clear skies, there was a collision between two ships. The POTOMAC was a United States flagship which was owned by Potomac Transport Inc., a Delaware corporation which had its principal place of business in care of OMI Corp., a successor to Ogden Marine Inc., whose principal place of business was 280 Park Avenue, New York, New York. BAANI was a Bangladesh flag general cargo vessel owned by Bangladesh Shipping Corp. ("BSC"), a corporation organized and existing under the laws of Bangladesh.

Sometime after 0100 on February 8, 1982, the POTOMAC and the BAANI approached each other in a "crossing situation" west of the Florida Keys in the Gulf. The International Regulations for Preventing Collisions at Sea, 1972, 33 U.S.C. foll. § 1602, ("Rules of the Road"), governed the conduct of the vessels. POTOMAC was the "give-way" vessel and BAANI was the "stand-on." Visibility was 5 to 6 miles. At 0142 POTOMAC's bow struck BAANI's starboard quarter, causing the BAANI's engine room to be flooded with sea water. Fortunately, no one was injured although most of BAANI's crew was removed by lifeboat to another nearby ship.

The BAANI was on a voyage from Houston, Texas to Baltimore, Maryland with a cargo of rags, frozen shrimp and other unspecified items. The POTOMAC was on a ballast voyage from Port Manatee, Florida in Tampa Bay to Seattle, Washington.[1]

The POTOMAC admits that it was the ship's custom and practice to man the ship with a master and four mates. (BSCX 44 at 48–40). The chief mate normally did not stand a watch when the ship was at sea. Rather, it was the custom and practice on the POTOMAC for the sea watches to be stood by the second mate and the two third mates—a three-watch division.

The POTOMAC, however, departed Port Manatee on this unfortunate voyage without its regular second mate on board. (BSCX 44 at 45–47). The ship sailed with one chief mate (Toren Lovenhardt) and two third mates (Ken Bagley and Kampmann) (PX 93 at 31). Rather than ordering the chief mate to stand a watch in the regular second mate's stead, Captain Hansen requested that the two third mates split the unattended watches and they agreed to do so. (Tr. 126–128).

Captain Hansen allowed the two third mates to arrange the following watch division for the voyage:

---

1. All of the above was stipulated to in the "Joint Pre-Trial Order."

| Date | Watch Period | Mate on Watch |
|------|-------------|---------------|
| 2.7.82 | 0400–0800 | Kampmann |
| 2.7.82 | 0800–1200 | Bagley |
| 2.7.82 | 1200–1600 | Kampmann |
| 2.7.82 | 1600–1800 | Bagley |
| 2.7.82 | 1800–2000 | Capt. Hansen |
| 2.7.82 | 2000–2400 | Bagley |
| 2.8.82 | 0000–0400 | Kampmann (collision at about 0142) |

(PX 93 (Hansen dep.) pp. 45, 122–124; PX 3; Tr. 116–118, 123). If the regular second mate had been aboard the POTOMAC (or had Captain Hansen ordered the chief mate to stand watch in his stead) the three-watch division would have been as follows:

| Date | Watch Period | Mate on Watch |
|------|-------------|---------------|
| 2.7.82 | 0400–0800 | Second Mate/Chief Mate |
| 2.7.82 | 0800–1200 | Kampmann |
| 2.7.82 | 1200–1600 | Bagley |
| 2.7.82 | 1600–2000 | Second Mate/Chief Mate |
| 2.7.82 | 2000–2400 | Kampmann |
| 2.8.82 | 0000–0400 | Bagley |

(BSCX 44 (Gordon dep.) p. 83; Tr. 244–245, 454–455).

John H. Kampmann, the Third Officer of the POTOMAC, testified at the trial. He had graduated from the United States Merchant Marine Academy in Kings Point, Long Island with a B.S. Degree in 1981. (Tr. 14, 15). During the fall of 1981, Mr. Kampmann coached high school football, rather than going to sea. (Tr. 19). Although there were sea projects during his undergraduate career at Kings Point, he served as a Deck Cadet, not a Ship's Officer, while at Kings Point. (Tr. 15–17). Mr. Kampmann is, however, a duly-licensed Third Officer of ocean-going vessels of unlimited tonnage, having received United States Coast Guard approval as a Third Officer. On February 6th Kampmann became the Third Mate on the POTOMAC and he stood the first watch of his nautical career from 2000 hours to 2400 hours on that night. (Tr. 20, 21).

On his fourth watch, 0000–0400 hours February 8, 1982 POTOMAC was sailing without a gyro compass because of a failure of that compass on February 7, 1982. (Tr. 24). POTOMAC was steering by magnetic compass and its radar was operational during the time in question. (Tr. 25, 28). POTOMAC's two VHF radios were switched on, one monitoring channel 16 and the other, Kampmann testified, probably channel 13 (Tr. 29, 255). There were a lookout and helmsman on duty with Kampmann. (Tr. 55).

Prior to the encounter with the BAANI two other vessels appeared on POTOMAC's radar scope and they passed without incident. (Tr. 31). At 0124 the radar showed that POTOMAC and BAANI were in a close quarters situation in which POTOMAC would cross ahead of BAANI's BOW. (Tr. 44). Kampmann wanted to alter POTOMAC's course so as to pass astern of BAANI. At this point, POTOMAC's course was 235° magnetic and BAANI's was 108.5° magnetic. (Tr. 47, 48). BAANI's speed was 13.5 knots (Tr. 47) and POTOMAC's speed was 10.7 knots. (Tr. 57). One minute after BAANI was 5 miles from POTOMAC, Kampmann altered PO-

TOMAC's course from 235° magnetic[2] to 265°, a turn to starboard. (Tr. 59).

While testifying Kampmann utilized PX 86a to chart the movements, course, speed and expected location of each ship at various points up to the time of the collision. It was when the two ships were some five miles apart that he first visually sighted the BAANI.

Kampmann first testified that if POTOMAC had maintained its 265° bearing at 10.7 knots she would have crossed BAANI's course line at 0141 and the BAANI's port side would have passed POTOMAC's bow at a distance of .65, .66 nautical miles. This assumed BAANI did not change course and continued at a speed of 13.5 knots. He later corrected this to say the crossing would have been at 0139.6 at a distance of .11 nautical miles. (Tr. 72, 74). After steadying on 265° Kampmann saw that BAANI was maintaining a steady course and their crossing would be a close quarters situation. Therefore, he continued to alter his course to starboard ordering his helmsman to turn to 275°. (Tr. 66). This course change to 275° was after one minute on 265°. (Tr. 75). Had the vessels stayed at the same speeds and on the same course lines, after the turn to 275°, BAANI would have crossed POTOMAC's bow at 1.99 miles. (Tr. 80). However, BAANI started to come left on POTOMAC's starboard bow while POTOMAC steered on 275°. While Potomac was at 275° BAANI's white masthead lights were visible to Kampmann and at first BAANI's red (port) light was visible. But then Kampmann saw BAANI's green side light, indicating that BAANI's starboard side was what POTOMAC was sailing towards. (Tr. 84). Kampmann then ordered POTOMAC to come 20° more to right to 295°. (Tr. 85). As this maneuver, which was estimated as taking 60 seconds, occurred, BAANI turned to port. (Tr. 85). Kampmann ordered a Hard Right, sounded a Danger Signal of 5 short blasts of the ship's whistle and then gave an order for POTOMAC's engines to go Full Astern. (Tr. 87). He dispatched the lookout to the Captain's cab-

in and sounded a second Danger Signal. (Tr. 87).

It was at this point with POTOMAC on a course heading of 315° that POTOMAC's bow struck BAANI's starboard quarter. (Tr. 88). Kampmann heard no signal from the BAANI prior to the crash. (Tr. 88). At the time of collision, BAANI's heading was approximately 045°.

As the events unfolded, BAANI's bridge was manned by a watch officer and lookout. They were Olan Dachuna and Muhammad Rahman, both of whom testified by deposition (PX 102, PX 103). There was no helmsman on the BAANI (PX 103, p. 6) and when Rahman, the lookout, first sighted the POTOMAC Dachuna, the Second Mate, was in the chart room, not on the bridge. When Rahman first saw the POTOMAC, he reported this to the Second Mate (PX 103, p. 6, PX 102, p. 38). At that time, Dachuna was in the chart room checking courses to Baltimore (PX 102, p. 38) and the BAANI was on automatic steering (PX 103, p. 6). The radar on the BAANI was not on (PX 103, p. 25). Dachuna went on the bridge and saw, through his binoculars, "a single white light" of the POTOMAC, but no side light at a distance of "about six miles" (PX 102, p. 35, 36). Dachuna took a bearing on the light and then went back into the chart room for what he described as "approximately three minutes." When he came out of the chart room for the second time Dachuna sighted the green and both white lights of the POTOMAC and he described the condition as "a crossing situation" under the Rules of the Road in which POTOMAC was the giveway vessel and BAANI the stand-on vessel. He admitted that under the Rules of the Road "[t]he stand-on vessel shall maintain their course and speed" (PX 102, p. 41) [sic]. He then watched the POTOMAC for some thirty seconds and altered course to port at "approximately two miles." (PX 102, p. 42). Dachuna further testified that had POTOMAC changed her course thirty degrees to starboard, he would have seen it and not altered BAANI's course to port (PX 102, p. 54, 55).

**2.** All course headings will be set forth as mag- netic, unless otherwise indicated in the text.

Of course POTOMAC did change from 235° to 265° as Kampmann testified and Dachuna did not see this because he was in the chart room and not on the bridge. The Court rejects Dachuna's explanation that the POTOMAC "took very late action" (PX 112, p. 118). He was in no position to see what POTOMAC was doing while he was in the Chart House and not on the bridge.

Vernon Hansen, the Captain of the Potomac, and Keith Venkataramiah, the Captain of the BAANI, each testified by deposition. Both of them were asleep in their cabins until just before the collision and neither of them was able to supply illuminating evidence as to the events leading up to the collision or its direct cause. Kampmann had been off-duty for eight hours before assuming duty on the watch during which the encounter with the BAANI took place (PX 93, p. 129) and the Court specifically finds that the amount of rest Kampmann enjoyed prior to the watch at issue had little to do with the collision. This does not mean, however, that the assigned watch rotation could not have been a factor in the collision.

The deposition testimony of William Lewis, the lookout on the POTOMAC, at the time of the collision confirmed Kampmann's testimony in major detail. As he testified (PX 95, p. 28, 29), the BAANI's left turn caused it to pass in front of POTOMAC's bow twice.

Three experts testified at trial, one for the POTOMAC interests, and two for BSC. Of these, Potomac Transport's expert, Captain Arthur Fertig, was by far the most impressive and the most persuasive. He "conservatively" has been in the Gulf of Mexico approaching the straits of Florida 200 times. (Tr. 371). The Court concludes that his testimony was the most credible in explaining the collision, the reasons for it and the events leading up to it. BSC's experts, Haruzo Eda and Captain Warren Hardy, are honorable gentlemen but their opinions as to the key events were not as convincing as Captain Fertig's. Mr. Eda who has a P.H.D. in engineering came to the United States in 1961. (Tr. 519). He has no coast guard license and has never

stood watch at sea. A pleasant theoretician, his lack of practical experience rendered his views of little help to the Court. Captain Hardy retired from sea duty in 1980 (Tr. 599) and has not returned since then. (Tr. 619). His experience is not as broad as Captain Fertig's, but nevertheless on cross-examination he did state that if he had been on the bridge of the BAANI as the POTOMAC made its course turn from 235° to 265°, he would have seen it. (Tr. 637). Perhaps, the most telling portion of the Hardy testimony was that he thought that the BAANI's mate should have been on the bridge and that had that mate been looking directly at the POTOMAC lights he would have seen her change of course. (Tr. 641).

Captain Fertig felt that the 30° turn from 235° to 265° by POTOMAC was "substantial" and that by looking at the position of a vessel's range lights one could see that a vessel has changed its bearing. (Tr. 387, 388). But Dachuna did not see POTOMAC's course change because he was in BAANI's chart room, not on the bridge (p. 8 and 9 *supra*). Fertig convincingly testified that "I don't know what else he (Kampmann) could have done to be in keeping with the international rules of the road." (Tr. 444). According to Fertig, the Potomac did everything it was supposed to—"It did everything but go back to Tampa." (Tr. 482). He agreed with all of Kampmann's actions, but believed that he would also have attempted to contact the BAANI on the VHF radio which Kampmann did not do. (Tr. 483). Fertig was frank in acknowledging that he personally observes his new mates on the bridge to gauge them and their abilities. (Tr. 445). This was something which Hansen did not do. (PX 93, p. 129, 130).

Captain Fertig believed that the photographs of the two ships taken after the collision indicate that the POTOMAC was nearly stopped at the time of the collision. (Tr. 393). This is confirmed by the fact that no one testified that the impact of the collision knocked him off his feet. The most telling testimony from Captain Fertig was that Dachuna, as the pilot of the standon vessel, never should have turned

at all and that if he was to make any turn, it should have been to the right, not to port. (Tr. 379, 399).

The Court concludes that the primary responsibility for the accident lies with the BAANI and that its negligence far outweighed any negligence of the POTOMAC. As Captain Fertig described it, BAANI's watch officer's conduct was "neglectful" in "many respects" on the morning in question. (Tr. 397).

However, as Cargo Claimants point out in their Postrial Memorandum of Law, p. 2, on a clear night such as February 8, 1982 some fault is likely to attach to each vessel for the collision.

In *The Comus*, 19 F.2d 774 (2d Cir.1927) the court held at page 776,

"Where, on a clear night, two vessels see each other 6 or 7 miles apart, and then come into collision on the wide ocean, there is a heavy burden upon each of them to explain their navigation in an endeavor to exonerate themselves from fault."

*See also The West Hartland*, 2 F.2d 834, 836 (9th Cir.1924).

The Court has found no authority overruling *The West Hartland* or *The Comus*. Moreover, at trial Kampmann (Tr. 41, 146) admitted that although he began to plot the BAANI's position on his radar screen, he was unable to complete his rapid radar plotting (Tr. 154–159) and he did not compute the course and speed of the BAANI on his radar scope (Tr. 303, 331). He described himself as "unhappy" with his radar plot (Tr. 150, 154). Rule 8(e) of the Rules of the Road dictated that he should have slackened POTOMAC's speed at that point "to allow more time to assess the situation." Considering all the facts and circumstances of the case,[3] the Court concludes that although primary responsibility for the collision rests with BAANI, there was some negligence by POTOMAC.

The Court fixes fault at these percentages: BAANI is 75% responsible for the collision, and POTOMAC 25% responsible.

## CONCLUSIONS OF LAW

■ It is axiomatic that "[c]ollision liability is based on fault; the mere fact of impact has no legal consequence." G. Gilmore & C. Black, *The Law of Admiralty* § 7–2, at 486 (2d ed. 1975). The parties agree that the Rules of the Road provide the pertinent standards of care in this case. As Gilmore & Black commented:

"The Rules of the Road ... are of extreme importance in the allocation of collision liability. More often than not, the finding of 'fault' on the part of the ship in collision rests on her having violated one of the Rules.... [T]hese Rules ... are strictly and literally construed, and compliance is insisted upon. This is as it should be, for, though they have the force of statute, they are not couched in legal terms of art, and are not lawyers' law, but are plain and simple directions addressed to ship's officers, the more competent among whom have most of them substantially committed to memory. G. Gilmore & C. Black, *supra* § 7–3, at 489."

The strict construction of the Rules of the Road must be applied in conjunction with "the Supreme Court's decision that violation of a statutory standard of care, establishing that vessel's fault, also shifts the burden on the proximate cause issue to the one violating the statutory rule to prove that the violation 'could not have been' one of the causes of the accident." *Arabian American Oil Co. v. Hellenic Lines, Ltd.*, 633 F.Supp. 659, 666 (S.D.N.Y. 1986) (quoting *The Steamship Pennsylvania v. Troop*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874)).

It is undisputed that the collision at issue here arose out of a crossing situation. Rule 15 of the Rules of the Road provides:

---

**3.** Potomac Transport objected at trial to BSC's offer into evidence of BSCX 11, a U.S. Coast Guard Accident Report on the collision. The Court now sustains the objection and will not consider the Report in its decision. *See Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

"When two power driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel."

As the give-way vessel in the crossing situation POTOMAC was under an obligation "so far as possible, [to] take early and substantial action to keep well clear." Rule 16 of the Rules of the Road.

BAANI was bound as the stand-on vessel to hold her course and speed. Rule 17(a) provides:

(i) Where one of two vessels is to keep out of the way the other shall maintain her course and speed.

(ii) The latter vessel may however take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

An examination of POTOMAC's actions under the Rules of the Road must begin with a determination of whether Kampmann's avoiding actions in the crossing situation were "early and substantial." Kampmann employed POTOMAC's radar to determine that POTOMAC was the give-way vessel in the crossing situation with BAANI and that he was obligated to alter POTOMAC's course to starboard (Tr. 44–45). When BAANI's lights were visible and he had confirmed his radar observations, Kampmann ordered a course change from 235° to 265°. After one minute on 265°, he ordered a further starboard course change to 275°. After this turn, had both vessels maintained their speeds and courses, BAANI would have crossed POTOMAC's bow at 1.99 miles (Tr. 80).

Rule 8 of the Rules of the Road requires that:

"(b) Any alteration of course and/or speed to avoid collision, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course and/or speed should be avoided.

(c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.

(d) Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear."

With these standards in mind, the Court concludes that Kampmann's actions were "early and substantial" under the Rules of the Road.

Olan Dacunha, BAANI's watch officer, testified that he would have observed a 30° change in course and accordingly not altered BAANI's course. (PX 102, at 54). Captain Hardy agreed that a 30° change in POTOMAC's masthead and range lights would have been apparent to BAANI's watch officer (Tr. 637, 642). As noted *supra* p. 9, Dacunha failed to observe POTOMAC's course change because he was in BAANI's chart room, not on the bridge, when the change occurred. The Court concludes that if POTOMAC's red light did not show to BAANI (indicating a turn to starboard), it was because BAANI had hastily altered her course to port (Tr. 476). As Captain Fertig pointedly explained:

Q. Do you think that course change, to 275°, is substantial within the meaning [sic] of the rules of the road?

A. Yes. However, that was marred by the fact that the BANGLAR BAANI was turning to the left at the same time so there was never a period of time when he could have seen that light when he should have. If BANGLAR BAANI had kept her course and speed there would have been no problem at all.

(Tr. 430).

The Court rules that POTOMAC's avoiding actions were "early and substantial" under the Rules of the Road but were vitiated by BAANI's unwarranted turn to port.

This conclusion does not, however, entail a finding that POTOMAC was entirely free of fault. The evidence plainly establishes that Kampmann did not properly plot the position of the BAANI on POTOMAC's radar. Rule 7(b) provides that "proper use shall be made of radar equipment ... including long range scanning to obtain early warning of risk of collision and radar plotting, or equivalent systematic observation of detected objects." When the vessels were approximately 8 miles apart, Kampmann began plotting the BAANI on his radar (PX 11; Tr. 41, 146). He made his first mark on the screen ("00 position") at 0118 (PX 11; Tr. 36–37). Employing his radar plot, he determined a risk of collision existed because POTOMAC was going to pass ahead of BAANI with a closest point of approach ("CPA") of .85 nautical miles (Tr. 146–47). At this point Kampmann was unable to complete his rapid radar plotting of BAANI, and described himself as "unhappy" with the radar plot (Tr. 150, 154). Unable to complete the plotting, Kampmann made no further radar plots of BAANI after marking her "06" or 0124 hours position. Kampmann also failed to use his radar to compute the course and speed of BAANI (Tr. 303, 331).

The moment Kampmann recognized a problem with his radar plotting, Rule 8(e) required him to "slacken" POTOMAC's speed to afford "more time to assess the situation." His failure to immediately do so constituted a violation of the Rules of the Road and POTOMAC has not established that this violation could not have been one of the causes of the accident.

The Court also concludes that POTOMAC has not met its heavy burden under the *Pennsylvania* rule and shown that its assigned watch rotation could not have been a cause of the collision. It cannot be seriously urged that at the time of the collision POTOMAC was not being navigated in violation of the three-watch division required under 46 U.S.C. §§ 223 and 673. 46 U.S.C. § 223 provides in part:

"The Coast Guard shall make an entry in the certificate of inspection of every ocean and coastwise seagoing merchant vessel of the United States propelled by machinery, the minimum number of licensed deck officers required for her safe navigation according to the following scale:

No such vessel shall be navigated unless she shall have on board and in her service one duly licensed master.

Every such vessel of one thousand gross tons and over propelled by machinery, shall have in her service and on board three licensed mates, *who shall stand in three watches* while such vessel is being navigated,...." (emphasis added).

46 U.S.C. § 673 states:

"In all merchant vessels of the United States of more than one hundred tons gross, excepting those navigating rivers, harbors lakes (other than Great Lakes), bays, sounds, bayous, and canals, exclusively, *the licensed officers* and sailors, coal passers, firemen, oilers, and water tenders *shall, while at sea, be divided into at least three watches,* which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel." (emphasis added).

Under section 223, POTOMAC was required to be manned with at least the minimum number of deck officers as determined by the Coast Guard and noted in its Certificate of Inspection. POTOMAC's Certificate of Inspection required it to have on board one master, one chief mate, one second mate and one third mate. (PX 26). The section also dictates that POTOMAC's three mates stand in three watches while the vessel is navigated. This requirement is satisfied only when three mates stand in three watches. Merely manning the vessel, as the POTOMAC did on its fateful voyage, with the number of deck officers entered in the Certificate of Inspection does not comply with the statute. *See The Denali,* 105 F.2d 413, 416 (9th Cir.1939), *adhered to on reh'g,* 112 F.2d 952 (9th Cir.1940). Section 673 requires the same division of the mates' watches. *See New York & Cuba Mail S.S. Co. v. Continental Ins. Co. of City of New York,* 117 F.2d 404, 409 (2d Cir.1941); *District 2, Marine Engi-*

*neers Beneficial Ass'n v. Adams*, 447 F.Supp. 72, 79 (N.D.Ohio 1977).

As noted *supra* p. 4, POTOMAC normally was manned with a master and four mates. The absence of POTOMAC's regular second mate when the vessel departed Port Manatee, however, resulted in the two third mates splitting the watches (Tr. 126–28). Had the watches not been conducted in violation of the three-watch system, the regular three-watch division would have placed third mate Ken Bagley on watch at the time of the collision. *See infra* p. 5.

POTOMAC is unable to sustain its burden on the issue of proximate cause with respect to the violation of the three-watch division. It is contrary to reason to suggest that the presence of Kampmann instead of Bagley on the watch could not have been one of the causes of the collision. The mate on watch aboard the POTOMAC at the time of the collision must certainly be one of the two central figures in this accident, as his actions guided the course of one of the vessels involved. In *The New York Marine No. 10*, 109 F.2d 564 (2d Cir.1940), the Second Circuit Court of Appeals considered whether the absence of a deckhand required to be aboard a vessel involved in a collision was a cause of the collision:

> "Since the absence has been found, and the lack is admitted to be a statutory fault, [citations omitted] it is presumed that the fault is a contributory cause, and the petitioner must bear the burden of showing that it was not [citations omitted]. This burden it has not met, for it is *impossible* to say that the other deckhand might not have been on duty instead of Costello on the morning of the collision, had there been two deckhands on board."

*Id.* at 566 (emphasis added).

Here, Bagley was scheduled to have been on watch as the events at issue unfolded. It is impossible for the POTOMAC to demonstrate how the POTOMAC would have been navigated if Bagley had stood the 0000–0400 watch on February 8, 1982. Thus, POTOMAC cannot maintain that its failure to use the three-watch division could not have been a cause of the collision.

The Court believes that POTOMAC has sustained its burden under the *Pennsylvania* rule with respect to the assertion that Kampmann's failure to attempt to contact BAANI on the VHF radio was negligent. It is undisputed that BAANI did not have her VHF radio turned on in the early morning of February 8, 1982. Therefore, any attempt by Kampmann to contact BAANI on the VHF radio would have been futile. The failure by Kampmann to use the VHF radio thus could not have been a factor in the collision.

In view of the aforementioned violations of the Rules of the Road, the Court deems it appropriate to apportion 25% of the fault for the collision to POTOMAC.

### BAANI's Negligence

An evaluation of BAANI's actions on the early morning of February 8, 1982 reveals negligence of a significantly more serious nature than that attributed to POTOMAC. BAANI's watch officer, Dacunha was in the vessel's chartroom when his lookout informed him that a white light had appeared on BAANI's port bow. Dacunha went to the port wing and took a visual bearing of 093° gyro, 16° relative to her port bow (PX 102, at pp. 34–38). He estimated the distance to be six miles (*Id.*). Dacunha then returned to the chartroom. While Dachuna was in the chartroom, POTOMAC changed course to starboard 30° to 265°. Dacunha, of course, was oblivious to this change because he was not on the bridge. At approximately 0130, the lookout alerted Dacunha that he could see POTOMAC's range lights and green side light on BAANI's port bow (PX 103, at p. 8). Returning to the bridge, Dacunha made the ill-considered assumption that POTOMAC had maintained her course and speed while he was in the chartroom and thus altered BAANI's course to port in an effort to pass astern of POTOMAC (PX 102, at pp. 52, 54). His sole basis for this erroneous assumption was his belief that POTOMAC's bearing had remained constant while he was aware of the vessel's approach. PO-

TOMAC's bearing was changing constantly, however, while Dacunha was in the chartroom the second time. *See* PX 86A. Thus, Dacunha's alteration of direction to port put the vessels on a collision course.

BAANI does not dispute that as the stand-on vehicle in this close quarters situation, her first obligation was to maintain her course and speed. Rule 17(a)(i). BAANI asserts, however, that Dacunha's actions were proper under Rule 17(a)(ii), which authorizes evasive action by the stand-on vessel when "it becomes apparent" that the give-way vessel is not taking "appropriate action." The Court disagrees and concludes that BAANI's change of course was a blatant violation of Rule 17(a)(i) and by far the principal cause of the collision.

BAANI cannot justify her failure to maintain her course and speed under Rule 17(a)(ii) because no basis existed for a prudent navigator to order a course change at the time Dacunha returned to the bridge and altered course to port. Dacunha lacked all the information he would have gathered had he remained on the bridge after he became aware of POTOMAC's approach. Specifically, he would have observed POTOMAC's change in bearing and the change in the aspect of her range lights. Instead, Dacunha erroneously decided that POTOMAC did and would maintain her course and speed while the vessels were still more than three miles apart. This prompted BAANI's course change to port (Tr. 379). As Captain Fertig cogently noted:

"But the whole thing is that I can't understand how a man can come on the bridge, coming out of a lighted chartroom, and in 30 seconds make these determinations. It is impossible. Absolutely impossible."

(Tr. 470).

Dacunha's absence from the bridge while he was aware of POTOMAC's approach was also contrary to the dictates of Rule 5 of the Rules of the Road. That Rule provides:

"Every vessel shall at all times maintain a proper look-out by sight and bearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of risk of collision."

It cannot be credibly argued that Dacunha would have learned nothing more about the emerging close quarters situation had he remained on the bridge after taking his first bearing of the POTOMAC. The record amply demonstrates that if he had remained on the bridge, he would have seen POTOMAC's bearing decrease as she proceeded on her 235° course, and then turn to starboard. The Court believes that had Dacunha observed POTOMAC's course change, he would have recognized that POTOMAC was giving way as she was required to by Rule 15. Dacunha's actions were nothing short of precipitous:

"Action should not be taken by the stand-on vessel without first determining that risk of collision does in fact exist. Compass bearings should be observed accurately and the radar should be used to measure the range of the approaching vessel. The earliest moment for permitted action will obviously be related to the range and the rate of change of range."

Cockcroft & Lameiser, *A Guide to the Collision Avoidance Rules* 119 (3d ed. 1982).

BAANI seeks to justify her turn to port under Rule 17(b), which provides:

"When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision."

This rule should be read in conjunction with Rule 17(c), which states:

"A power-driven vessel which takes action in a crossing situation in accordance with subparagraph (a)(ii) of this Rule to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side."

The Court believes that BAANI's reliance on Rule 17(b) is misplaced. BAANI's argument that POTOMAC's action alone could not avoid the collision is belied by the facts before the Court. PX 86A

demonstrates that BAANI altered course to port between seven and eight minutes prior to impact, not two minutes before the collision as Dacunha testified at his deposition. POTOMAC had already commenced her turn to starboard in her attempt to pass astern of BAANI when BAANI altered her course to port, steering her into a collision course with POTOMAC.

Moreover, as Captain Fertig opined, BAANI's turn to port was entirely inappropriate under the circumstances of the close quarters situation (Tr. 379). The turn to port dramatically reduced the efficacy of POTOMAC's avoiding action because it increased the relative speed of the vessels to more than 23 knots as the range closed. In short, BAANI's turn to port is inexplicable and confounding to the Court. The turn amounted to a "U" turn which placed BAANI directly in POTOMAC's path.

The Court is also convinced that BAANI's failure to use her radar was a contributing factor to the collision. Rule 7 of the Rules of the Road underscores the importance of proper employment of radar:

"(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist. (b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equipment systematic observation of detected objects. (c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information."

" 'A vessel equipped with radar is under a duty to use it intelligently and fully, and the master or pilot who fails to do so is heavily burdened to prove that such fault did not contribute to the collision.' " *Arabian American Oil Co. v. Hellenic Lines, Ltd.*, 633 F.Supp. 659, 668 (S.D.N.Y.1986) (quoting *Williamson Leasing Co., Inc. v. American Commercial Lines, Inc.*, 616 F.Supp. 1330, 1340 (E.D.La.1985)). The Court need not tarry long on the question of BAANI's fault regarding failure to use

either of its two operational radars while she was sailing in the Gulf of Mexico and approaching the Straits of Florida. Frequent radar observations would have immediately revealed POTOMAC's bearing changes as well as her course and speed alterations (Tr. 372, 374, 397–98, 456–57, 459, 461–62, 640, 654, 658). It would be generous to state that BAANI's alteration of course to port was based upon "scanty information." Rule 7(c).

BAANI also violated Rule 34(d), which provides:

"When vessels in sight of one another are approaching each other and from any cause either fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other vessel to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. Such signal may be supplemented by a light of at least five short and rapid flashes."

Dacunha testified that he never considered sounding five blasts because POTOMAC "appeared to be maintaining her course and speed." (PX 102, at pp. 124–25). The Court believes that Dacunha's proffered excuse does not answer why no alarm was ever sounded. Absent from the understanding of Rule 34(d) evidenced in Dacunha's testimony is the requirement of blasts where doubt exists as to whether sufficient action is being taken by the other vessel to avoid collision. Dacunha knew that POTOMAC was the give-way vessel in the crossing situation. He also testified that he believed POTOMAC was maintaining her course and speed, not taking avoiding action. It is startling therefore that Dacunha apparently supposed that BAANI could unilaterally assume the role of give-way vessel, particularly when Dacunha had such "scanty information" upon which to base his decision.

Finally, the Court believes that BAANI's failure to contact POTOMAC on the VHF radio constituted an infringement of Rule 2, which requires a vessel to take "any precaution which may be required by the

ordinary practice of seamen, or by the special circumstances of the case." A prudent, cautious navigator would certainly have sought to communicate with a vessel approaching in a crossing situation (Tr. 136, 371, 376, 379, 643–44). Kampmann testified that POTOMAC was being navigated prior to the collision with its two VHF radios switched on (Tr. 29, 255). BAANI has failed to demonstrate that its failure to attempt to contact POTOMAC on a VHF channel could not have contributed to the collision.

## CONCLUSIONS OF LAW CONCERNING LIMITATION OF LIABILITY

■ Potomac Transport, Inc. ("PTI"), as corporate owner, and Ogden Marine Inc. (now "OMI Corp."), as managing agent for POTOMAC, have petitioned this Court for limitation of liability pursuant to The Limitation of Vessel Owner's Liability Act, 46 U.S.C.App. § 181 *et seq.* Section 183 provides that:

> "The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss or destruction by any person of any property, goods or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

46 U.S.C.App. § 183(a).

"The decision of whether to allow limitation is made in two steps: the court must determine (1) what acts of negligence or unseaworthiness caused the accident, and (2) whether the shipowner had knowledge or privity of these acts." *In re Ocean Foods Boat Co.*, 692 F.Supp. 1253, 1258 (D.Or.1988). The Second Circuit Court of Appeals has embraced a restrictive application of the limitation statute, under which ambiguities should be resolved against limiting liability. *See, e.g., In re Barracuda Tanker Corp.*, 409 F.2d 1013, 1015 (2d Cir.

1969); *Petition of Dodge*, 282 F.2d 86, 89 (2d Cir.1960).

Privity and knowledge under the statute "have been construed to mean that a shipowner knew or should have known that a certain condition existed." *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir.1984). Where a corporate shipowner is involved, " 'privity and knowledge' means the privity and knowledge of a managing agent, officer, or supervising employee, including supervisory shoreside personnel." *In re Hercules Carriers*, 566 F.Supp. 962, 977 (D.Fla.1983), *aff'd*, 768 F.2d 1558 (11th Cir.1985). *See also In re Petition of Henry Dubois' Sons Co.*, 189 F.Supp. 400, 402 (S.D.N.Y.1960). The shipowner seeking limitation of liability bears the burden of proving that it was without privity or knowledge of the condition responsible for the collision. *See Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. 1374, 1387 (S.D.N.Y.1986). The Court believes that PTI and OMI have not sustained their burden of proof concerning their limitation of liability.

■ A vessel owner has a duty to provide an adequate and competent crew for the vessel's intended voyage. *See Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204, 210 (5th Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968). The crew must be prepared not only for "an uneventful voyage, but for any exigency that is likely to happen." *In re Pacific Mail S.S. Co.*, 130 F. 76, 82 (9th Cir.), *cert. denied*, 195 U.S. 632, 25 S.Ct. 790, 49 L.Ed. 353 (1904). Captains Hardy and Fertig concurred that one of a ship Master's responsibilities is to observe a new mate, particularly a mate on his first voyage after receiving his license, to assess his capabilities (Tr. 613–14). POTOMAC's Master, Captain Hansen, merely conducted a cursory interview of Kampmann (Tr. 38–39). He stood no watches observing Kampmann and provided no training program for Kampmann (Tr. 130–31). The failure of a ship's Master to exercise diligence in selecting, training, or supervising crew members whose navigation faults contribute to an accident is proper ground to deny limitation

of liability. *See, e.g., Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); *Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. 1374, 1390 (S.D.N.Y.1986).

■ Limitation of liability is properly denied to PTI and OMI for an additional reason. A vessel owner also is responsible for insuring that the master operates the vessel consistent with "rules" and "reasonable judgment." *Spencer Kellogg Co. v. Hicks*, 285 U.S. 502, 512, 52 S.Ct. 450, 453, 76 L.Ed. 903 (1932). *See also Agrico Chemical Co. v. S.S. Atlantic Forest*, 459 F.Supp. 638, 648 (E.D.La.1978). As is fully discussed *supra* pp. 18–21, POTOMAC was navigated in violation of the three-watch system after she departed Port Manatee. POTOMAC is properly denied limitation of liability because her Master failed to insure compliance with the statutorily mandated three-watch division. *See In re Petition of Henry Dubois' Sons Co.*, 189 F.Supp. 400, 402 (S.D.N.Y.1960) (denying limitation of liability where owner's agent's negligent "supervision over the phase of the business out of which the loss ... occurred" contributed to loss). *Accord New York & Cuban Mail S.S. Co. v. The Continental Ins. Co.*, 117 F.2d 404 (2d Cir.1941).

■ OMI also seeks to limit its liability, arguing that it is entitled to the same protection as Potomac Transport because it is the "owner in possession of POTOMAC." Post Trial Mem. at 40. "As a general rule, one who is subjected to a shipowner's liability because of his exercise of dominion over a vessel should be able to limit his liability to that of an owner." *Dick v. United States*, 671 F.2d 724, 727 (2d Cir.1982). Here, however, limitation is plainly inappropriate as OMI's predecessor, Ogden, is charged with "privity and knowledge" of POTOMAC's violation of the three-watch division.

Jack Gordon, POTOMAC's port captain, was an Ogden employee. As port captain, Gordon was responsible for insuring that all crew members were on board before sailing and that the vessel was fit to sail. (BSCX 44 at pp. 8–10, 35). Gordon was aware that POTOMAC's second mate was not aboard the ship when she prepared to depart Port Manatee (BSCX 44 at pp. 60–61, 83). Nevertheless, he and Captain Hansen decided to allow the vessel to sail without one of its customary watch-standing officers. *Id.* Gordon made no inquiry of Captain Hansen as to how the second mate's absence would affect POTOMAC's watch-standing system. *Id.* at p. 51, 84. Thus, Gordon failed to fulfill the owner's responsibility to insure that POTOMAC sailed in compliance with statutory regulations. OMI is deemed to have knowledge of this negligence "which may be a contributing cause" of the collision. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1158 (2d Cir.), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). OMI's petition for limitation of liability is denied.

### Cargo Claimants' Crossclaim

■ Cargo claimants have also asserted a crossclaim sounding in breach of contract against their carrier BSC. The rights and liabilities of cargo claimants and their carrier BSC with respect to the crossclaim are governed by the United States Carriage of Goods by Sea Act. ("COGSA"), 46 U.S.C. App. § 1300 *et seq.* Section 4(2)(a) of COGSA, 46 U.S.C.App. § 1304(2)(a) provides that "[n]either the carrier nor the ship shall be responsible for loss or damage to cargo resulting from—

(a) Act, neglect, or default of the master, mariner, pilot or the servants of the carrier in navigation or in the management of the ship."

The shipowner (BSC) has the burden of demonstrating that an "error of navigation" exempts it from liability to cargo claimants. *Director General of India Supply Mission v. S.S. Maru*, 459 F.2d 1370, 1372 (2d Cir.1972), *cert. denied*, 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973). If the shipowner sustains this burden and establishes that an error of navigation led to its contribution to the loss, "a cargo owner may defeat the owner's claim of exemption by showing that an unseaworthy condition of the vessel was a concur-

ring cause." *Complaint of Thebes Shipping Inc.*, 486 F.Supp. 436, 438 (S.D.N.Y. 1980). *See also Firestone Synthetic Fibers Co. v. M.S. Black Heron*, 324 F.2d 835, 837 (2d Cir.1963).

Having ruled that Dacunha's negligent seamanship contributed to the collision, the Court concludes that BSC's negligent navigation has been established. Thus, in order to hold BSC liable to cargo claimants, cargo claimants must prove that the unseaworthiness of BAANI contributed to the loss.

"The standard of seaworthiness requires that the ship be reasonably fit for the use intended." *Amerada Hess Corp. v. S/T Mobil Apex*, 602 F.2d 1095, 1097 (2d Cir. 1979). "A condition of unseaworthiness may exist due to an inadequate crew, either in number or in competence." *Complaint of Delphinus Maritima, S.A.*, 523 F.Supp. 583, 593 n. 1 (S.D.N.Y.1981). A vessel may be deemed unseaworthy on account of crew incompetence evidenced by improper response to an emergency. *See Cerro Sales Corp. v. Atlantic Marine Enterp., Inc.*, 403 F.Supp. 562, 567 (S.D.N.Y.1975).

The Court finds that BAANI was unseaworthy under COGSA on account of its inadequate crew. As the Court detailed *supra* pp. 21–27, Dacunha's actions aboard BAANI in the close quarters situation were woefully wanting in competent seamanship and common sense. The Court therefore rules that BAANI's unseaworthiness contributed to the collision.

"If unseaworthiness is shown as a cause, the shipowner, in order to escape liability, must sustain the burden of proving that it exercised due diligence at the beginning of the voyage in respect to the condition found by the court to be unseaworthy." *Thebes Shipping*, 486 F.Supp. at 438. Any doubts regarding the shipowner's exercise of due diligence must be resolved against the shipowner. *See Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704, 724 (S.D.N.Y.1977). Having studied the record, the Court concludes that BSC has failed to shoulder its burden that it took proper measures to insure that its crew could competently respond to a close quarters situation. Thus, the Court rules that BSC is liable to cargo claimants for the damages sustained by them in the collision.

### SUMMARY CONCLUSION

The Court ascribes fault for the collision at 75% to BAANI and 25% to POTOMAC. Potomac Transport's and OMI's petitions for limitation of liability are denied. Having determined that BAANI's unseaworthiness within the meaning of COGSA contributed to cargo claimants' loss, the Court rules that cargo claimants are entitled to recover from BSC, Potomac Transport, and OMI the damages sustained by them in this collision. The parties are directed to appear for a conference on December 11, 1989 in Courtroom 444 to set a trial date to determine the amount of damages recoverable in this action.

SO ORDERED.