FIREMAN'S FUND INSURANCE COM-
PANIES; Compagnie D'Assurances
Maritimes Aeriennes Terrestres; Great
American Insurance Company; Aetna
Insurance Company; Phoenix Insurance
Company, a foreign Corporation, Plain-
tiffs–Appellees,

v.

BIG BLUE FISHERIES, INC., an Alaska
Corporation, Plaintiff–Intervenor–
Appellee,

v.

F/V KEVLEEN K, her engines, tackle,
gear, equipment and appurtenances,
Defendant,

and

Farr Fisheries, Inc., a Washington Corpo-
ration, Harold A. Brindle; Winn F.
Brindle; Alec Brindle, in Personam, De-
fendants–Appellants,

v.

BIG BLUE FISHERIES, INC., an Alaska
Corporation, Plaintiff–Intervenor–
Appellee.

FIREMAN'S FUND INSURANCE COM-
PANIES; Compagnie D'Assurances
Maritimes Aeriennes Terrestres; Great
American Insurance Company; Aetna
Insurance Company; Phoenix Insurance
Company, a foreign Corporation, Plain-
tiffs–Appellants,

v.

F/V KEVLEEN K, her engines, tackle,
gear, equipment and appurtenances,
Farr Fisheries, Inc., a Washington Cor-
poration, Alec Brindle, In Personam;
Winn F. Brindle; Harold A. Brindle,
Defendants–Appellees,

v.

BIG BLUE FISHERIES, INC., an Alaska
Corporation, Plaintiff–Intervenor.

Nos. 96–36053, 96–36135.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1998.

Decided April 24, 1998.

Jerome C. Scowcroft, Schwabe, Williamson & Wyatt, Seattle, WA, for defendants–appellants.

Paul Daigle, Seattle, WA, for defendants–appellants.

Thomas G. Waller, Bauer Moynihan & Johnson, Seattle, WA, for plaintiffs–appellees.

Before: BROWNING, SKOPIL, JR., and O'SCANNLAIN, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

The Kevleen and the Big Blue collided while fishing in the Bering Sea. The district court held both vessels liable, apportioning 85% of the fault to the Kevleen, and 15% to the Big Blue. The Kevleen appeals the district court's refusal to fault the Big Blue because its lookout failed to plot the Kevleen's course on radar. The Big Blue and its insurers cross-appeal the district court's demurrage award to the Kevleen. We uphold the district court's finding that the Big Blue's use of radar was non-negligent, but reverse the district court's demurrage award because it is unsupported by the record.[1]

## I.

The Big Blue and the Kevleen were under way in the Bering Sea in the early morning hours of February 4, 1994. The Big Blue initially steamed at 5.2 knots on a southwesterly course made good ("course") of 226 degrees.[2] The Kevleen initially steamed at between 8 and 9 knots on a northeasterly course of 30 degrees. In order to compensate for wind and sea conditions, the Big Blue's heading was slightly to port of its course, and the Kevleen's heading was slightly to starboard of its course.

Tom Thissen stood watch on the Big Blue, and initially sighted the Kevleen visually and by radar when the vessels were six miles apart. Thissen noted that the oncoming vessel's bearing was on or slightly to port of the Big Blue's heading, which indicated that the ships were on reciprocal or head-on courses. When the Kevleen's heading failed to change as the distance between the ships closed to three miles, Thissen made a 10 degree starboard turn to facilitate the port-to-port passing mandated by the Rules of the Road in head-on situations.[3] As the vessels neared, Thissen made three attempts to contact the Kevleen by radio, but all failed. When the ships were about one mile apart, Thissen tried to turn 90 degrees to starboard using his autopilot, but failed to execute the turn fully.

Lance Farr, standing watch on the Kevleen, used his radar to plot the Big Blue's position when the ships were six miles apart

---

1. The Kevleen appeals the district court's finding that the vessels were on nearly-reciprocal courses, its refusal to find the collision was caused by various navigational errors by the Big Blue's lookout, and its apportionment of liability. The Big Blue cross-appeals the district court's finding that the Kevleen required permanent repairs in Seattle during the 1994 cod season. We address these claims in a separate unpublished memorandum disposition filed this date.

2. A *course made good* refers to a "single course from the point of departure to point of arrival at any given time." *American Practical Navigator, Hydrographic Office Publication No. 9 (Bowditch)* 66 (1962). A vessel's *heading* is "the direction in which a vessel is pointed." *Id.* In contrast to a vessel's course made good, its heading "is a constantly changing value as a vessel oscillates or yaws back and forth across the course." *Id.* Finally, a *bearing* "is the direction of one terrestrial point from another, expressed as angular distance from a reference direction, usually from 000 at the reference direction, clockwise through 360." *Id.*

3. It is undisputed that the Kevleen and the Big Blue are subject to the International Regulations for Preventing Collisions at Sea (COLREGS), commonly known as the Rules of the Road. *See* 33 U.S.C. foll. § 1602.

and again when they were three miles apart. Farr believed the ships were on crossing courses, which gave the Kevleen the right of way and required the Big Blue to stay clear. Farr did not take the Big Blue's bearing, but noted it was constant. When the ships were three miles apart, Farr turned his attention away from the approaching Big Blue to plan his next crabbing run. When he looked up, the ships were two boat lengths apart. He attempted to put the Kevleen in reverse and turn, but failed.

The Kevleen struck the Big Blue on its port beam at a 90 degree angle, but neither ship sank. The Big Blue secured temporary repairs, and completed its opilio crab season. The ship sought permanent repairs in Seattle at the end of June, and consequently missed the 1994 halibut season. The Kevleen also made temporary repairs and completed its opilio crab season, but cut its cod fishing season short to obtain permanent repairs in Seattle.

The Big Blue's insurers filed suit against the Kevleen in federal court, alleging the collision was caused by the latter's negligence. The Big Blue and its owners and crew intervened to recover lost profits and the cost of their insurance deductible. The Kevleen counterclaimed, alleging the Big Blue caused the collision. The district court found both vessels negligent, apportioning 85% of the fault to the Kevleen, and 15% to the Big Blue. The court awarded both vessels repair costs and loss of profits.

## II.

■ The Kevleen contends the district court erred in refusing to find that the Big Blue violated COLREGS Rule 7 as a matter of law because its lookout failed to plot the Kevleen's course on radar. This court reviews an admiralty court's conclusions of law de novo. *See Havens v. F/T Polar Mist*, 996 F.2d 215, 217 (9th Cir.1993).

Rule 7 provides, in pertinent part:
(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.
(b) Proper use shall be made of radar equipment if fitted and operational, includ-

ing long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.
33 U.S.C. foll. § 1602, Rule 7.

■ The question is what constitutes "proper use" of radar under Rule 7. The Kevleen argues Rule 7(b) always requires vessels with radar plotting capability to make use of it to avoid collisions, but the language of Rule 7(b) does not support this bright line rule. Rule 7(b) specifies that proper use of radar includes radar plotting *or* equivalent observation. The collision avoidance concerns underlying Rule 7(b) do not warrant a rigid radar plotting requirement; rather, "whether radar should be used to supplement a proper visual lookout will depend on the circumstances and the adequacy of the lookout." *Farwell's Rules of the Nautical Road* 240 (Captain Richard A. Smith, ed., 7th ed.1994). Relying on radar plotting to identify and avoid risk of collision could itself be negligent when the equipment yields confusing results. *See Pocahontas Steamship Co. v. The Esso Aruba*, 94 F.Supp. 486, 490 (D.Mass.1950).

■ The Second Circuit has therefore rejected the argument that Rule 7(b) always requires use of available radar plotting or electronic collision avoidance equipment. *See Ching Sheng Fishery Co. v. United States*, 124 F.3d 152, 160 (2d Cir.1997)(noting that "although it has been held that failure to effectively use radar is a statutory violation, there is no support for the broader proposition that only radar plotting or use of a computer-aided collision avoidance system satisfies COLREG 7") (citation omitted). We also decline to hold Rule 7(b) categorically requires a ship with radar plotting capability to use it, and instead examine whether, under the circumstances, the use of radar was "equivalent to" or as effective as radar plotting.

Courts generally determine whether a particular method of radar observation is equivalent to radar plotting by comparing the information provided by the method with that provided by radar plotting. The Fourth Circuit has found a Rule 7 violation where a lookout employed a method of radar observa-

tion that provided only the closest point of approach, reasoning that radar plotting would also have provided the course, speed, and relative motion of the approaching vessel. *See Hellenic Lines, Ltd. v. Prudential Lines, Inc.,* 730 F.2d 159, 163 (4th Cir.1984). Similarly, district courts have found Rule 7 violations where available radar was used only to determine a vessel's closest point of approach, *see G & G Shipping Co., Ltd. v. M/V Nedlloyd Van Noort,* 767 F.Supp. 398, 409 (D.P.R.1991), where a lookout used radar to plot an approaching vessel's course incompletely, *see Potomac Transp., Inc. v. OMI Corp.,* 741 F.Supp. 395, 403 (S.D.N.Y.1989), *aff'd in part, vacated in part on other grounds,* 909 F.2d 42 (2d Cir.1990), and where personnel failed to use sophisticated radar equipment effectively to track the approach of an oncoming vessel, *see Ocean Foods Boat Co. v. M/V Tosca,* 692 F.Supp. 1253, 1262–63 (D.Or.1988).

These cases are distinguishable. Although Thissen did not know how to plot on the Big Blue's radar, he was able to track the Kevleen's approach accurately by observing his radar and taking visual bearings. According to Thissen's radar and visual observations, the Kevleen had a constant bearing of 0–3 degrees off his heading, making it clear that the Kevleen's heading was essentially reciprocal to his own, and that a collision was imminent. Radar plotting would not have yielded additional, relevant information about the Big Blue's approach.

■ This is not to suggest that in all head-on situations, taking visual bearings and tracking a vessel's approach on radar without plotting will satisfy Rule 7(b). Had the Kevleen's course been more erratic, or a full point off the Big Blue's heading, radar plotting might have been required to gauge the risk of collision more accurately. In this case, however, the Kevleen had a constant bearing within a few degrees of the Big Blue's heading, making the risk of collision readily apparent without radar plotting.

■ Even if Thissen's conduct amounted to a Rule 7 violation, the Big Blue satisfied its burden under the *Pennsylvania* rule. The *Pennsylvania* Rule requires a party who has violated a statute intended to prevent collisions to present clear and convincing evidence that the violation was not a proximate cause of an ensuing collision. *See Trinidad Corp. v. S.S. Keiyoh Maru,* 845 F.2d 818, 825 (9th Cir.1988).[4] The Big Blue presented strong evidence that Thissen carefully tracked the Kevleen, that he properly concluded from his observations that the vessels were on reciprocal headings, and that radar plotting would not have helped him avoid the collision. Where radar plotting would have yielded no helpful information, the failure to plot an oncoming vessel's course is not a proximate cause of an ensuing collision. *See C.G. Willis, Inc. v. The Spica,* 6 F.3d 193, 198 (4th Cir.1993)(explaining that "[r]adar plotting would have provided [the lookout] with no additional information that could have allowed him to anticipate the [approaching vessel's] sudden turn"); *Rich Ocean Car Carriers S.A. v. M/V Sanko Diamond,* 1989 A.M.C. 220, 226 (M.D.Fla.1988)(finding no Rule 7 violation where "the use of the radar and collision avoidance device would only have provided the exact distances and alerted the mate to the fact that the ships were on a collision course," a fact of which the mate "was fully aware").

### III.

■ The Big Blue contends the district court erred in calculating damages due the Kevleen for loss of profits from the 1994 cod

---

4. The Kevleen suggests that the trial court misapportioned liability under the *Pennsylvania* Rule. The Rule only establishes a presumption that certain statutory violations are a proximate cause of an ensuing collision; "it does not determine ultimate liability for damages." *Sheridan Transp. Co. v. United States,* 834 F.2d 467, 478 (5th Cir.1987); *see also Crown Zellerbach Corp. v. Willamette–Western Corp.,* 519 F.2d 1327, 1329 (9th Cir.1975) ("The [*Pennsylvania* ] Rule concerns only the question whether the alleged statutory violation was one of the collision's causes."); George Rutherglen, *Not with a Bang but a Whimper: Collisions, Comparative Fault, and the Rule of the Pennsylvania,* 67 Tul. L.Rev. 733, 736 (1993)("many cases have held that the rule of the *Pennsylvania* is entirely irrelevant" to apportionment of fault). Once it is established that the actions of both vessels caused the collision, the district court then apportions liability or fault according to comparative negligence principles. *See Miller v. Christopher,* 887 F.2d 902, 904 (9th Cir.1989).

season. We review an admiralty court's computation of damages for clear error. *See Howard v. Crystal Cruises, Inc.*, 41 F.3d 527, 530 (9th Cir.1994).

■ It is well settled that an admiralty court may award "demurrage," damages for the loss of profits resulting from a vessel's lay up for collision repairs. *See The Conqueror*, 166 U.S. 110, 127, 17 S.Ct. 510, 516–17, 41 L.Ed. 937 (1897). Demurrage is proper only "when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty." *Id.* at 125, 17 S.Ct. at 516. The amount of the award should be limited by the time required to complete necessary collision repairs. *See Pan-American Petroleum & Transp. Co. v. United States*, 27 F.2d 684, 685 (2d Cir. 1928)(L.Hand, J.). If a vessel's lay up is extended to complete repairs or maintenance unconnected to the collision, demurrage should be awarded only for time spent repairing collision damage. *See Bouchard Transp. Co. v. The Tug "Ocean Prince"*, 691 F.2d 609, 613 (2d Cir.1982)(explaining that "[t]here should indeed be no abatement [of demurrage] if [the] owner's repairs do not extend the detention period beyond the time required for collision repairs") (citation and internal quotations omitted). It follows that any extension in a vessel's lay up unrelated to collision repairs and within the shipowner's control is excluded from demurrage.

■ The cod fishing season extends from March 1 to mid-June, about 14 weeks. The district court awarded the Kevleen lost profits based upon its finding that she "would have fished for cod from about April 20 to mid-June 1994," but was prevented from doing so by the collision. This award is clearly erroneous for two principal reasons. First, demurrage is based upon actual losses resulting from a vessel's lay up, and the Kevleen was not in drydock during the loss period found by the district court: the Kevleen departed the Bering Sea seeking permanent repairs on March 9, arrived in Seattle on March 17, and left drydock on April 20. Because the Kevleen could have fished in the Bering Sea between April 20 and mid-June, this is not a proper loss period for demurrage.

■ More important, the length of the district court's loss period is unsupported by the record. The district court's seven-week loss period is equivalent to the length of time between the Kevleen's March 9 departure from the Bering Sea for repairs in Seattle to its April 20 departure from dry dock, plus an additional week's travel time returning to the Bering Sea. This includes three weeks during which the Kevleen was tied to a dock and not under repair: the Kevleen arrived in Seattle on March 17, but did not enter drydock for repairs until April 14. There is no explanation for this delay in the record. Because demurrage is limited to the time actually required for collision repairs, the reason for the Kevleen's three week delay is crucial. If the three weeks the Kevleen spent tied to a dock was caused by the shipowners' own inaction or procrastination, the Kevleen could have been repaired in about four weeks, and spent ten weeks fishing. Assuming, as did the Kevleen's expert, that the Kevleen ordinarily would have had a 61–day (i.e. eight to nine week) cod season, the Kevleen could have fished a full cod season. If so, the shipowners' own conduct, rather than the collision repairs, caused any loss of profit, and the district court's demurrage award would be improper. If, however, the delay was caused by circumstances beyond the Kevleen's control, the district court's demurrage award might be sustainable.

Because the record reveals no evidence that the Kevleen's extended stay in Seattle was somehow related to collision repairs, we reverse the district court's demurrage award and remand the case for further consideration of this issue.

Each party to bear its own costs.

**Affirmed in part, reversed in part, and remanded.**