Martha MAKIN, Personal Representative of the Estate of David B. Makin, et al., Plaintiffs,

v.

EMPRESA LINEAS MARITIMAS ARGENTINAS, Defendant.

Civ. A. No. 78–2810–N.

United States District Court, D. Massachusetts.

March 21, 1986.

Jerome V. Flanagan, Bertram E. Snyder, Hoch, Flanagan & Snyder, Jerome Flanagan, Flanagan & Hunter, Boston, Mass., for plaintiffs.

Richard B. Kydd, Kneeland, Kydd & Handy, Boston, Mass., Kieron Quinn, Quinn, Ward, & Kershaw, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

DAVID S. NELSON, District Judge.

These consolidated admiralty cases arise out of a collision between an Argentine dry bulk carrier, the M/V SANTA CRUZ II (SANTA CRUZ), owned by the defendant, Empresa Lineas Maritimas Argentinas, S.A., (ELMA) and the United States Coast Guard Cutter CUYAHOGA (CUYAHOGA), on October 20, 1978 in the lower Chesapeake Bay off the coast of Baltimore, Maryland. The CUYAHOGA sank minutes after the collision; eleven of her crew died and others were injured. The plaintiffs, four injured crewmen on the CUYAHOGA and those suing on behalf of the eleven who died, bring this action pursuant to 28 U.S.C. § 1330(a) 1976 against ELMA for its alleged liability in this tragic accident.

In an earlier action, defendant ELMA sued the United States under the Public Vessels Act ("PVA"), 46 U.S.C. §§ 781–785, seeking recovery for damages to the SANTA CRUZ and for indemnity and contribution for any claims arising out of the accident for which ELMA might be held liable to third parties.[1] In a memorandum opin-

---

1. On January 26, 1982, this Court denied defendant's motion to dismiss the present action on the basis of collateral estoppel because plain-

ion, Judge Blair of the District Court of Maryland found that multiple errors of judgment and perception by Captain Robinson of the CUYAHOGA were the sole causes of the collision. Consequently, the United States was held to be 100% liable. *ELMA v. U.S.A.*, 1979 AMC 2607 (D.Md. 1979). The court also held, however, that the government was entitled to limit its liability under 46 U.S.C. § 183(a) to the value of the CUYAHOGA, because the United States did not have privity or knowledge of the cause of the collision.

Before judgment was entered, Judge Blair died. The case was reassigned to Judge Thomsen, who reopened the case and held another trial at which additional evidence was received. Judge Thomsen agreed with Judge Blair's conclusion that the CUYAHOGA was solely responsible for the collision. Judge Thomsen, however, held that the United States could not limit its liability under § 183(a) because "one or more persons in the chain of command over Robinson had knowledge or were charged with knowledge of the existence of Robinson's physical problems and loss of sleep, which were responsible for his bad judgment, the cause of the collision." *ELMA v. U.S.A.*, 1982 AMC 2668, 2680 (D.Md.1982). The court also found that ELMA's claim for indemnity and contribution was premature because damages had yet to be rendered against ELMA by this court in the consolidated cases filed by the survivors and representatives of the deceased personnel of the CUYAHOGA. In *ELMA v. U.S.A.*, 730 F.2d 153 (4th Cir.1984), the Fourth Circuit affirmed this ruling.

The plaintiffs in the present action, while acknowledging that the CUYAHOGA's command on deck was partially at fault for the accident, allege a series of acts or omissions on the part of the SANTA CRUZ that they assert constitute negligence. After

trying the issues of liability and receiving additional expert testimony, the court finds that there was no negligent act or omission on the part of the SANTA CRUZ that contributed to the collision.[2] The Court finds that the accident was entirely caused by the confusion on the bridge of the CUYAHOGA on the night of the accident, the inexperience of her crew, and the errors of judgment made by the CUYAHOGA's commanding officer. The court enters the following findings of fact and conclusions of law in support of its judgment.

FINDINGS OF FACT

1. The SANTA CRUZ had been built in 1976 and was a single screw, single rudder, diesel-powered vessel approximately 521 feet long with a displacement tonnage of over 6,000 tons. She left the Port Covington Coal Pier of Baltimore Harbor bound for Buenos Aires, Argentina with a load of 19,000 tons of coal at 2:30 p.m. on the afternoon of October 20, 1978. She was piloted down the Chesapeake Bay by John Hamill, a licensed Maryland master pilot who had made over 700 trips on the Bay, 70 percent of which had been at night. The full-time Argentine crew of the SANTA CRUZ included, *inter alia*, Captain Abelardo Albornoz, who had nearly thirty years at sea, and Chief Officer Thomas Staiano, who had sailed as chief officer of various vessels since 1967.

2. At about 8:45 p.m., the SANTA CRUZ approached and passed port of the Lighted Bell Buoy No. 50 off the mouth of the Potomac River heading southward on a course of 170 degrees. Visibility on the Chesapeake Bay was at least eight miles, the seas were calm, and the wind light.

3. Soon after passing Buoy 50, Pilot Hamill changed the course of the SANTA CRUZ to 163 degrees. The SANTA CRUZ

---

tiffs had not exercised a sufficient amount of control in the earlier suit to warrant preclusion.

**2.** In addition to reviewing evidence introduced at the Baltimore trial, the court heard the testimony of Captain Robinson of the CUYAHOGA and Pilot Hamill, Captain Staiano, and Captain Albornoz of the SANTA CRUZ. The court also

received testimony from plaintiff's expert witnesses: Captain Cornelius Houtsma, Captain Clarence S. Hall, Captain Alfred Fiore and Captain Arthur W. Smith; and defendant's experts, Captain Robert O. Elsensohn, Captain Alex Kaufman and Captain James Stillwagon.

was making 14.4 knots over the ground. At approximately this time, Pilot Hamill noticed the CUYAHOGA on the radar over eight miles away from the SANTA CRUZ.

4. The CUYAHOGA, under the command of Chief Warrant Officer Donald K. Robinson (Captain), was northbound in the Chesapeake Bay on an officer candidate training cruise from her base in Virginia. Built in 1926, she was about 125 feet long with a displacement tonnage of nearly 300 tons. She had left Yorktown that afternoon with most of her regularly assigned crew and sixteen trainees on board. An inked track line on the CUYAHOGA's chart called for her to proceed north until she reached the mouth of the Potomac, when she was to turn left into the river for her overnight anchorage.

5. Upon sighting the CUYAHOGA at about eight miles range, Pilot Hamill evaluated the situation as a routine port-to-port, north-south meeting. Although he kept his eye on the bearing of the other ship, he did not direct anyone on board the SANTA CRUZ to plot her course or to determine the closest point of approach (CPA). Neither did he attempt to establish radio contact.

6. By 9:00 p.m., Pilot Hamill could observe the CUYAHOGA's sidelights change from red alone to red and green. The vessel had changed course—turning left from 338 degrees to 303 degrees—to proceed into the Potomac River. The radar on the SANTA CRUZ indicated that the CUYAHOGA was approximately one to one and one-quarter miles away. Her turn would take her directly across the bow of the SANTA CRUZ.

7. According to his testimony, Captain Robinson of the CUYAHOGA had erroneously guessed that the SANTA CRUZ was a small vessel travelling in the same direction as the CUYAHOGA into the Potomac, rather than a large vessel on an opposite, southerly course heading toward Smith Point Light. Having wrongly concluded that the CUYAHOGA and the SANTA CRUZ were travelling in the same direction, Captain Robinson estimated that

by turning left, the CUYAHOGA would overtake the SANTA CRUZ and cross astern of the vessel. His course change, however, taken when the ships were over one mile apart, placed the CUYAHOGA and the SANTA CRUZ in a crossing situation.

8. Sometime after he saw the CUYAHOGA turn, Pilot Hamill sounded a short blast of the SANTA CRUZ's whistle, indicating that the SANTA CRUZ planned to hold course and speed as required by law. In a crossing situation, where the ships are close enough to involve risk of collision, the rules of the nautical road provide clear directions. The rules dictate that the vessel which is crossing (with the other on her starboard side) must keep out of the way, that is, turn, slow down, stop or reverse, in order to avoid colliding with or crossing ahead of the other vessel. The SANTA CRUZ, as the "privileged" vessel is required to maintain course and speed so that the "burdened" vessel might easily predict her movements. The CUYAHOGA, however, altered course still further left to 290 degrees as Captain Robinson continued to misperceive the course of the CUYAHOGA as paralleling his direction into the Potomac.

9. After his first blast, Pilot Hamill allowed the SANTA CRUZ to continue on course 163 degrees at 13.9 knots. It appeared to those on board the SANTA CRUZ that the CUYAHOGA, a small, highly maneuverable vessel with a turning diameter of approximately 500 feet, could easily move out of the way if necessary. Hearing no response to the first blast, the SANTA CRUZ sounded a second blast.

10. After the second blast by the SANTA CRUZ, Captain Robinson ordered the CUYAHOGA's engine full astern and sounded one whistle. He did not sound the required three blast signal to indicate backing. Before this time, the CUYAHOGA had not attempted any evasive maneuvers as the distance between the two vessels narrowed to between one-quarter and one-half mile. No one on board the SANTA CRUZ heard any whistle signals from CU-

YAHOGA from the time she turned to a course that would take her across the SANTA CRUZ's bow until collision.

11. As time passed and the distance between his vessel and the CUYAHOGA decreased with no apparent change in the relative bearing of either vessel, Pilot Hamill became increasingly concerned. Hearing and seeing no response to his second blast, he sounded the danger signal—five short blasts—at a distance of one-quarter of a mile. After again hearing no acknowledgment, he sounded a second danger signal, had the helm pull over hard left, and ordered the engine stopped.

12. By this time, the bow of the SANTA CRUZ was 500 to 650 feet, roughly one ship length of the SANTA CRUZ, from the CUYAHOGA, ten to twelve seconds before collision. After having ordered the CUYAHOGA to back down, Captain Robinson realized that he should try to move forward to avoid a collision but did not have time to order the engines ahead. The CUYAHOGA had slowed down right in the path of the SANTA CRUZ, cancelling the larger vessel's evasive maneuver.

13. Both ships were equipped with operable radiotelephone sets on the bridge-to-bridge frequency. The court finds, however, that there was no obligation on the part of the SANTA CRUZ to attempt to contact the CUYAHOGA by telephone. The SANTA CRUZ was entitled, until the two vessels were *in extremis*, to rely on the reasonable expectation that the CUYAHOGA would comply with the rules of the road. Moreover, although the CUYAHOGA had a telephone with bridge-to-bridge frequency, a vessel of its size is not required to carry one and there was no reason for the SANTA CRUZ to expect a response. Pilot Hamill's efforts in studying the movement of the CUYAHOGA, consulting the radar, signalling several times and waiting for reply signals, and attempting evasive maneuvers when the two vessels were *in extremis* satisfied his duties under the nautical rules of the road.

14. At 9:07 p.m., the bow of the SANTA CRUZ struck the starboard quarter of the CUYAHOGA approximately twenty-five feet from the stern. The CUYAHOGA rolled over onto her port side and sank in two to three minutes. Neither of the CUYAHOGA's lifeboats, which were supposedly set to release and surface when under water, came to the surface. None of CUYAHOGA's lifejackets, which were supposedly buoyant and had automatic lights attached, surfaced. Nor did the CUYAHOGA's general collision alarm sound and awaken the men sleeping below deck. The CUYAHOGA, among the oldest vessels in the Coast Guard, was fifty-two years old. The Court finds that her deteriorated material condition, which included an obsolete and unreliable radar set, was a contributing factor in the tragic accident.

15. The SANTA CRUZ slowed down further, came around to starboard, lowered a lifeboat and picked up the eighteen men who survived the collision. Eleven of the crew on board the CUYAHOGA died and four men sustained injury.

16. Captain Robinson was subsequently tried by a Coast Guard General Court Martial and convicted of being derelict in the performance of his duties "as Commanding Officer of CUYAHOGA in failing to ascertain the position, course, and speed of the SANTA CRUZ before changing the course of CUYAHOGA from 338 degrees to 303 degrees and thereby putting CUYAHOGA on a collision course with the SANTA CRUZ." Captain Robinson testified at the Court Martial that it was his practice onboard the CUYAHOGA while travelling at night and seeing another vessel approaching him in a meeting situation, to have a CPA prepared by the Quartermaster or the Navigation Instructor. He did not do so, however, on the night of the tragedy because "the particular section that I had on watch was extremely inexperienced and was having great difficulty in doing their maneuvers ..."

17. The court finds that the inexperienced complement of personnel aboard the CUYAHOGA was inadequate to perform the duties of the vessel. Prior to leaving Yorktown, Executive Petty Officer

Neal A. Verge, the only other senior duty officer usually aboard the CUYAHOGA, was allowed to remain at home without a replacement. In addition, James W. Blacketer, the regular machinery technician on the CUYAHOGA, remained ashore. Other personnel were moved up a notch and the result was a crew that included fewer experienced personnel than usual for the purpose of the voyage into the Potomac. For example, the crew included a seventeen-year old in the lookout position who was experiencing his first day at sea.

18. None of the experienced permanent crew aboard the CUYAHOGA called to Captain Robinson's attention that the turn which he ordered in front of the SANTA CRUZ created a serious danger of collision. One of the officer candidates, however, did report earlier to Robinson that he saw two white lights and one red light on the SANTA CRUZ, putting him on notice that the approaching vessel was not a small commercial fishing vessel about to turn into the Potomac as Robinson mistakenly believed. The court finds that Robinson's poor reactions, errors of judgment and misperceptions were due to his inability to obtain adequate sleep. Such lack of sleep was due to his frequent coughing during the night, about which he had complained repeatedly to the medical clinic at Yorktown, which gave him prescriptions for possible remedies on many occasions during the summer and autumn of 1978. The day before the collision Robinson visited Walter Reed Hospital and complained of wheezing, shortness of breath, and sleeplessness. The medicines prescribed for Robinson during the three months before the collision did not materially improve his condition. At least two officers in the chain of command above Captain Robinson at Yorktown knew of his frequent appearances on the list of persons seen at the Yorktown clinic but took no reasonably adequate steps to determine whether his medical condition affected his ability to perform his duties as the commanding officer of the CUYAHOGA. Robinson had been cited on two occasions in connection with collisions which had occurred while he commanded the CU-YAHOGA. After investigating these accidents, which occurred in April and May of 1978, the Coast Guard reprimanded Robinson for exercising poor judgment. These incidents, combined with Robinson's history of medical problems during the period of July to October, 1978, indicate that the Coast Guard should have seriously considered whether Robinson was fit for duty as commanding officer of the CUYAHOGA. *See also, ELMA v. U.S.A.*, 730 F.2d 153, 156–57 (4th Cir.1984).

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this nonjury civil action because, as stipulated by the parties, the defendant, Empresa Lineas Maritimas Argentinas: (1) is an "agency or constitutionality" of Argentina under 28 U.S.C. § 1603(b), therefore qualifying as a "foreign state" within the meaning of 28 U.S.C. § 1603(a); and (2) carries on "commercial activity ... in the United States" as defined in 28 U.S.C. § 1603(d), (e) thereby falling within the general exception to 28 U.S.C. § 1605(a)(2) to foreign sovereign immunity. Venue is proper in this district court under 28 U.S.C. § 1391(f)(3).

2. Two sets of rules, the Navigation Rules for Harbors, Rivers and Inland Waters (hereinafter Inland Rules) codified at 33 U.S.C. § 154 *et seq.* and the Pilot Rules promulgated at 33 C.F.R. *et seq.* are applicable to this case. The relevant Inland Rules are found in the section on Steering and Sailing, Articles 18–29. The Pilot Rules appear in the sections entitled, "General Signals and Situations", sections 80.-01–80.13.

3. The plaintiffs claim that, from the moment the SANTA CRUZ first sighted the CUYAHOGA, the SANTA CRUZ committed a series of statutory violations that contributed to the eventual collision of the two vessels. Plaintiffs concede that Captain Robinson made serious errors, but argue that Pilot Hamill was also somewhere in the order of thirty percent at fault for the collision. They allege that the SANTA

CRUZ failed: 1) to sound the requisite whistle signals; 2) to conduct evasive maneuvers at the appropriate time; 3) to contact the CUYAHOGA by radio; and 4) to post a proper lookout. The Court considers the plaintiffs' main theories of liability in turn and, for the following reasons, finds none of them persuasive.

■ 4. Plaintiffs argue that the SANTA CRUZ should have sounded a single blast of its whistle to establish a port-to-port passing situation with the CUYAHOGA prior to the burdened vessel's turn at a one-mile distance. The court finds that plaintiffs have misconstrued the relationship of the two vessels prior to the turn as a head-on situation. The applicable nautical rule limits the signalling requirement "to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision, in other words ... by night to cases in which each vessel is in such a position as to see both the side lights of the other." The rule specifically provides that "[i]t does not apply ... at night to cases where the red light of one vessel is opposed to the red light of the other ... or where a red light without a green light ... is seen ahead." *See Inland Rule*, 33 U.S.C., Art. 18, Rule I; *Pilot Rules*, 80.4, 80.3, 33 C.F.R. sec. 80.4, 80.3. Both vessels saw only the port side light of the other until the CUYAHOGA turned, showing first both lights then the green starboard light only. Pilot Hamill therefore had no duty to signal during the intervening distance between his initial sighting of the CUYAHOGA at eight miles and the turn by the CUYAHOGA at one mile.

■ 5. Plaintiffs' expert witnesses testified that the SANTA CRUZ was required to conduct evasive maneuvers prior to meeting the CUYAHOGA *in extremis* because of "the special circumstances" rule. *Pilot Rules*, 80.11, 33 C.F.R., sec. 80.11. The "imminent peril" to which the special circumstances rules refer, however, is not the risk of collision presented by the burdened vessel in a crossing situation, for which the Rules clearly provide. "Imminent peril" refers to a factor outside the

relationship such as a third vessel, ice or adverse weather conditions. *See* R. Farwell, Rules of the Nautical Road, (5th Ed. 1977) p. 372. The Court finds that nothing about the conditions that evening—the visibility of eight miles, the calm seas and light wind—created obligations beyond those required by a crossing situation.

■ 6. Plaintiffs argue that, after the CUYAHOGA initiated its turn at 303 degrees, an insufficient opportunity existed to comply with the rules applicable to a crossing situation. In construing the requirements of the rules, the courts make the common-sense qualification that, "where a crossing situation develops, the crossing rules will apply only if there is a fair opportunity to navigate under them," J. Griffin, *The American Law of Collision*, sec. 45, p. 117 (1949). The court finds that there was more than sufficient time and distance for the two vessels to take action in accordance with the crossing rules. When the CUYAHOGA initiated its turn, more than one mile separated the two vessels.

■ 7. Plaintiffs' experts insist that the SANTA CRUZ was obliged to sound a danger signal prior to meeting the CUYAHOGA *in extremis*. This testimony conflicts with the applicable rules of the nautical road. To sound a danger signal merely signifies "doubt" under the rules. *Inland Rules*, Art. 18, 33 U.S.C., Rule III; *Pilot Rules*, 80.1, 33 C.F.R. sec. 80.1. The rules define "doubt" as when a "vessel fails to understand the course or intention of the other from any cause." The court finds that the subjective condition of "doubt" under the rules did not arise until the CUYAHOGA failed to respond to the second single blast. Until the time at which the SANTA CRUZ and the CUYAHOGA approached each other *in extremis*, Pilot Hamill had no reason to experience doubt about what was a normal crossing situation. By holding course and speed and signalling his intention with single blasts of her whistle, *Pilot Rules* 80.03(3), 33 C.F.R. sec. 80.03(3), the SANTA CRUZ was in full

compliance with the rules governing crossing situations.

8. The SANTA CRUZ was correct in sounding the danger signal at a distance of a quarter mile, at approximately the same time Pilot Hamill began to doubt whether the CUYAHOGA would keep its obligation to stay clear. *Inland Rules,* Art. 18, 33 U.S.C. sec. 203, Rule III; *Pilot Rules,* 80.1, 33 C.F.R. sec. 80.1. With a turning diameter of 500 feet at a distance of about twelve times the length of the 125 foot CUYAHOGA, the smaller vessel had ample time and space to maneuver in approaching the SANTA CRUZ *in extremis. ELMA v. U.S.A.,* 1979 AMC at 2614.

9. The SANTA CRUZ did not breach a statutory duty under the Radio-telephone Act by not contacting the bridge of the CUYAHOGA prior to collision. *Inland Rules,* 33 U.S.C. secs. 1201 *et seq.; Pilot Rules,* 33 C.F.R. sec. 2604(b). The requirement is that each vessel maintain a listening watch and transmit navigational information as "necessary." The rule is discretionary; it supplements rather than supplants the Pilot and Inland Rules. As required by law, Pilot Hamill maintained a listening watch. His primary duties, however, were to make constant observations of the CUYAHOGA, to react to her maneuvers, and to signal continually his course and speed. It is unreasonable to have expected him to also radio the CUYAHOGA, a vessel too small to have been required by law to carry a radiotelephone with bridge-to-bridge frequency.

10. The SANTA CRUZ was not absolutely required by law to have a bow lookout. Moreover, even had it had one, it is unclear what additional information he might have contributed and in what respect the information might have changed the outcome. Pilot Hamill saw the CUYAHOGA at a distance of eight miles, observed her on radar, and never lost sight of her up until the time of impact. Courts have consistently held that "a ship is not held liable when what the lookout would have learned was already

known." *Consolidated Grain v. Wisconsin Barge Line,* 522 F.Supp. 842, 847 (E.D. Mo.1981). After the SANTA CRUZ sounded her first danger signal, the situation degenerated into an *in extremis* relationship, and Pilot Hamill acted properly by giving the danger signal, slackening speed and coming hard to port. He was able to comply fully with his obligations under the rules without the benefit of a bow lookout. *See Pilot Rule* 80.11, 33 C.F.R. sec. 80.11; *Inland Rules,* Art. 27, 33 U.S.C. sec. 212.

11. The CUYAHOGA violated every applicable rule of the road on the night of the collision in the following respects: directing her course across the bow of the SANTA CRUZ; failing in her obligation to avoid the privileged vessel; and sounding one blast whistle while moving further to port. *Inland Rules,* Arts. 19, 21, 22, 23; 33 U.S.C. secs. 204, 206, 207, 208; *Pilot Rules* 80.2, 80.9, 80.03; C.F.R. secs. 80.7, 80.9, 80.3. She failed to give three short blasts to signal that she was backing prior to collision, a final error in judgment that precisely voided the evasive maneuver made by the SANTA CRUZ, thereby assuring the tragic outcome. The CUYAHOGA even failed to satisfy the rules applicable to its misperception of the course of the SANTA CRUZ. The one-blast signal given by the CUYAHOGA would have been inappropriate to signal the starboard-to-port overtaking situation she wrongly presumed would occur. *Inland Rules,* Art. 18, 33 U.S.C. sec. 203, Rule VIII. *See also, ELMA* at 2613–14.

## SUMMARY

The collision between the SANTA CRUZ and the CUYAHOGA was caused solely by the CUYAHOGA without fault on the part of the SANTA CRUZ. The collision was caused by Captain Robinson's multiple errors of judgment and perception, his absolute misapplication of the nautical rules of the road, the inexperience of his crew and the failure of the Coast Guard to challenge his fitness for duty. The court finds the CUYAHOGA to be wholly liable for the catastrophe and, accordingly, assesses no

liability to the SANTA CRUZ. Judgment is entered for the defendant.