CHING SHENG FISHERY CO.,
LTD., Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 697, Docket 96–6161.

United States Court of Appeals,
Second Circuit.

Argued March 4, 1997.

Decided Aug. 26, 1997.

William F. Dougherty, Burke & Parsons, New York City, for Plaintiff–Appellant.

Arthur J. Gribbin, United States Department of Justice, New York City (Frank W. Hunger, Assistant Attorney General, Mary Jo White, United States Attorney, Janis G. Schulmeisters, Attorney in Charge, on the brief), for Defendant–Appellee.

Before: WALKER, McLAUGHLIN, Circuit Judges, and CHIN,\* District Judge.

WALKER, Circuit Judge:

Plaintiff-appellant Ching Sheng Fishery Co., Ltd., ("Ching Sheng") appeals from the final judgment of the United States District Court for the Southern District of New York (Allen G. Schwartz, *District Judge* ), relieving the United States of liability for damages resulting from a collision in the Malacca Strait between plaintiff-appellant's Taiwanese flag commercial fishing vessel, the HUI KUO NO. 16, and the USNS PONCHATOULA (the "PONCHATOULA"), a civilian crewed United States Navy oiler operated by the Navy's Military Sealift Command, based on its finding that the United States was not negligent. Because we agree with the district court that Ching Sheng bears sole responsibility for the collision, we affirm.

## BACKGROUND

The litigation leading to this appeal arose from the collision between the PONCHATOULA and the HUI KUO NO. 16 shortly before 5:30 a.m. on March 23, 1991, in the narrow Malacca Strait. Fortunately, there was no loss of life. Acknowledging that it bore some responsibility for the collision, Ching Sheng sued the United States seeking damages for contributory negligence.

The parties stipulated to certain facts which are detailed in the district court's opinion, familiarity with which is assumed. *Ching Sheng Fishery Co., Ltd. v. United States,* No. 93 Civ. 1634, 1996 WL 161789 (S.D.N.Y. Apr. 8, 1996). We summarize those facts relevant to this appeal.

On March 22, 1991, at 7:40 a.m.,[1] the HUI KUO NO. 16, equipped with a Furuno radar unit and a Tokyo Keiki (PR 2000) New Resco automatic pilot unit, departed Singapore, under the command of Captain Shaw Tzyh Ran ("Captain Shaw"), bound for the Indian Ocean, via the Malacca Strait, for an extended fishing voyage. As it passed through the Malacca Strait, the HUI KUO NO. 16 was headed in a generally northwesterly direction.

On March 23, 1991, at 12:01 a.m., the PONCHATOULA approached the western Malacca Strait, headed in a generally southeasterly direction, en route to Phattaya Beach, Thailand, following completion of a deployment to the Persian Gulf in support of

---

\* The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation.

1. The parties stipulated to these times which are given as approximations.

Operation Desert Storm. At the time, the PONCHATOULA was equipped with two separate radar units, a Raytheon three centimeter radar and a Raytheon ten centimeter radar. Both radars could be monitored from separate radar repeaters located on the bridge. A Raytheon Collision Avoidance System (the "RAYCAS") was connected to the PONCHATOULA's ten centimeter radar repeater. The RAYCAS is a computer system which gives the course and speed of a designated radar contact and provides the time, bearing, and range of the contact's closest point of approach (the "CPA"). Only one contact may be designated as the CPA at any one time on the RAYCAS.

At 3:40 a.m., the PONCHATOULA's Second Officer Stephen Gioulis reported to the bridge, and at 4:00 a.m., following a briefing by Third Officer Cleveland James, Gioulis officially assumed the 4:00 to 8:00 a.m. bridge watch. The PONCHATOULA's speed was 18.1 knots on a 140 degree course. There were light seas and clear skies, with a wind of approximately 7 knots. Visibility was good and sunrise would occur at 6:15 a.m.

At 3:58 a.m., Gioulis plotted the PONCHATOULA's position by taking a radar range and bearing of a nearby island and ordered the helmsman to change the vessel's course to 134 degrees. No other navigational fix of the PONCHATOULA's position was taken.

After 4:30 a.m., Gioulis used the Raytheon three centimeter radar to track three vessels, which were 11.25 to 22.5 degrees off the PONCHATOULA's port bow. After acquiring the vessels on radar, Gioulis was able to locate them visually using binoculars. Each vessel was showing a single red (port) side light. After making his initial observation of the three vessels and plotting their positions on the three centimeter radar over approximately a six-minute period, Gioulis concluded that the closest vessel (the "first tanker") would pass ahead of the PONCHATOULA, crossing her bow, and the other two vessels would pass down the PONCHATOULA's port side. At this time, the three vessels were at least ten miles ahead of the PONCHATOULA. Gioulis testified that he did not use the RAYCAS because he thought the

RAYCAS was experiencing technical problems that made its readings unreliable.

At 4:40 a.m., the first tanker turned to port, changing its display from the PONCHATOULA's vantage point from a red (port) side light to a green (starboard) side light, and started to move slowly across the PONCHATOULA's bow from port to starboard. Several minutes later, with the use of the vessel's alidade (which Gioulis testified is a telescope mounted over a compass repeater used to measure direction, course, and relative bearing of an approaching vessel), Gioulis noticed on the first tanker, in addition to the green side light, three vertical red lights that indicated that the vessel was constrained by its draft as defined by the International Rules of the Nautical Road. Once the first tanker had steadied on her new course and was "fine" (that is, within five degrees of the PONCHATOULA's bow) on the PONCHATOULA's starboard bow, Gioulis ordered the helmsman to come left from 134 degrees to a course of 125 degrees, to give the first tanker more room to pass down the PONCHATOULA's starboard side. It was now 5:00 a.m.

As he turned the PONCHATOULA to port, the helmsman actually overshot the ordered course of 125 degrees to 122 degrees, and Gioulis ordered the helmsman to steady on a course of 122 degrees. Shortly after the PONCHATOULA's course alteration, the first tanker altered its course to starboard to effect a starboard-to-starboard pass with the PONCHATOULA with a CPA of 1.7 miles.

Following the PONCHATOULA's course alteration, the two other vessels that Gioulis had been tracking were fine on the PONCHATOULA's port bow. Both continued to show red (port) side lights at a distance of approximately five nautical miles ahead of the PONCHATOULA. From his visual observations, Gioulis formed the impression that both vessels either were dead in the water or moving very slowly.

At 5:00 a.m., as Gioulis was altering the PONCHATOULA's course, the PONCHATOULA's master, Captain Peter Brent, arrived on the bridge. Captain Brent had not been called despite his orders that he be called once the PONCHATOULA approached within three hours of a point of

reference known as the One Fathom Bank. When Captain Brent arrived at the bridge, the PONCHATOULA, at its rate of 18 knots, would have reached the One Fathom Bank in two hours and fifteen minutes.

Once on the bridge, Captain Brent checked the Raytheon ten centimeter radar and noted the vessels on the PONCHATOULA's starboard side. Captain Brent's standing orders to his bridge watchstanders required that they maintain a minimum three mile CPA for coasters and fishing boats. If a watchstander was unable to achieve these CPAs or believed that a situation posed a danger, his orders were to call Captain Brent fifteen minutes before arriving within three nautical miles of another ship or one nautical mile of a coaster or fishing boat.

Captain Brent designated the first tanker on the RAYCAS and determined that the CPA would be 1.6 nautical miles. The Captain checked the navigation chart and noticed that there had not been a navigational fix since 4:13 a.m. Captain Brent went out on the starboard bridge wing to take visual bearings on the first tanker as it passed down the PONCHATOULA's starboard side. He noticed the two more distant contacts ahead which were both showing red (port) side lights. The Captain took visual bearings on the two contacts for about three minutes and concluded that the closer of the two (the "second tanker"), which was also the furthest to starboard and now showing both green and red side lights, was also going to pass down the PONCHATOULA's starboard side.

When the Captain asked Gioulis about the two contacts, Gioulis said that he was aware of the contacts and that the second tanker was displaying three vertical red lights, indicating its movements were constrained by its draft. Captain Brent asked Gioulis for his proposed course of action, and Gioulis stated that he intended to come to port a few more degrees to open up the CPA of the first tanker and then come back to starboard to the original course of 134 degrees. When the Captain asked Gioulis where the PONCHATOULA was, Gioulis replied that he was not sure since they had not had a satellite fix in a long time.

At 5:15 a.m., Captain Brent directed Gioulis to obtain a fix on PONCHATOULA's positions and relieved him of the "conn" of PONCHATOULA because he did not want Gioulis to attempt to get a fix and monitor the radar contacts at the same time. At this time, the second tanker was shown on radar to be three and a half miles away.

At 5:17 a.m., Captain Brent ordered the PONCHATOULA's speed reduced from 115 RPM to 60 RPM. The Captain estimated that it could take up to ten minutes to effect such a reduction in speed. Captain Brent took visual bearings on the two vessels ahead of the PONCHATOULA and determined that the second tanker would pass close down the PONCHATOULA's starboard side. He was concerned about the third vessel, the HUI KUO NO. 16, which, according to the Raytheon ten centimeter radar, was maintaining a constant bearing of about ten degrees off the PONCHATOULA's starboard bow and still showing a red (port) side light.

Captain Brent considered a turn to port, which was clear of traffic, since he was restricted from turning to starboard because the second tanker was now close to passing down PONCHATOULA's starboard side. The Captain used the Raytheon ten centimeter radar to determine that the HUI KUO NO. 16 was two and one-half nautical miles away. Captain Brent also designated the HUI KUO NO. 16 on the RAYCAS. Approximately 30 seconds to two minutes after he ordered the reduction in RPM from 115 to 60, Captain Brent noticed that the HUI KUO NO. 16 was now showing both red (port) and green (starboard) side lights. At this time, Captain Brent estimated that the HUI KUO NO. 16 was less than two miles away from the PONCHATOULA, bearing five degrees off PONCHATOULA's starboard bow.

Captain Brent now decided to turn to port, but before he could order a port turn, the HUI KUO NO. 16 again began showing only a red (port) side light. In addition, Captain Brent hesitated to turn to port because the international navigational rules required that he turn to starboard and because he did not know where the PONCHATOULA was at the time since a navigational fix had not been taken recently. At about this time, the

RAYCAS was no longer able to designate the HUI KUO NO. 16, "[p]robably because [it] was too small, too low to the water and too close by now."

At 5:21 a.m., Captain Brent ordered the engine room to stand by the engines. At 5:22 a.m., after deciding that the second tanker had cleared the PONCHATOULA's beam to starboard, Captain Brent ordered the helmsman to put the vessel's rudder over hard to starboard and directed the engine room to stop the engines. Approximately 30 seconds later, as the PONCHATOULA began to swing to starboard, the Captain ordered the engines "emergency back full."

From the starboard bridge wing, Gioulis informed Captain Brent that the PONCHATOULA could not go to starboard without hitting the second tanker. The Captain ordered his rudder shifted hard to port in order to stop the PONCHATOULA's starboard swing and took a visual bearing on the second tanker. After confirming that the PONCHATOULA was not restricted by the second tanker, Captain Brent again ordered his rudder shifted hard to starboard. The distance between the HUI KUO NO. 16 and the PONCHATOULA at this time was approximately one nautical mile.

The PONCHATOULA's starboard turn was slowed but not stopped by Captain Brent's momentary shift to port hard rudder. After the PONCHATOULA returned her rudder back hard to starboard, the HUI KUO NO. 16 commenced a port turn directly towards the PONCHATOULA. The HUI KUO NO. 16 was now showing only a green (starboard) side light.

At 5:25 a.m., Captain Brent sounded the emergency signal on the PONCHATOULA's whistle, and then sounded it again one minute later. When Gioulis heard the PONCHATOULA's whistle sounding the danger signal, he sounded the vessel's collision alarm. The HUI KUO NO. 16 did not alter its course as a result of the emergency signal and continued its port turn. Captain Brent stated:

At this point, there is nothing for me to do. I have got my engines going full stern. I have got a hard right rudder on. I'm trying to run away from this guy. He is continuing, as it appeared to me, to chase me. He actually keeps coming left and is hitting right into my bow. And as we are turning, he is coming down like this and he makes a left turn and just comes into my bow. He chased me right down and ran into—came in from the left side, my port side, and it was like he was trying to cross my bow.

The PONCHATOULA continued its hard starboard turn, with its engines full astern, to a course headed about 250 degrees.

At 5:27 a.m. the PONCHATOULA collided with the HUI KUO NO. 16. The PONCHATOULA struck the fishing vessel just forward of the latter's starboard beam, approximately forty-five feet aft of the bow. The PONCHATOULA had astern thrust (minus 30 RPMs) at the time the collision alarm sounded. The HUI KUO NO. 16 increased speed shortly before the collision. The HUI KUO NO. 16 was not restricted by traffic or shallow water from making a starboard turn to avoid the collision, and it never sounded a danger signal. Neither vessel attempted to contact the other by bridge-to-bridge VHF radio.

In a March 1991 Accident Report submitted to the Fisheries Representatives of the Counsel of Agriculture of the Republic of China, Captain Shaw stated that at 6:05 a.m. (Singapore time) he saw the middle masthead light of a vessel in front of the HUI KUO NO. 16's starboard bow. He stated that he asked the two deckhands on watch to pay attention to this vessel as he had to go to the stern to look at another vessel approaching the HUI KUO NO. 16 from her port stern. Afterwards Captain Shaw entered the cabin to use the toilet. He stated that at 6:16 a.m. he was walking back to the bridge when Deckhand Xu Xin Bin rushed out of the bridge to call him as the vessel in front of the HUI KUO NO. 16 was approaching. Upon Captain Shaw's return to the bridge, he saw the white light and green light of the approaching vessel. He stated that he immediately turned the wheel four to five degrees to port. Captain Shaw stated that at approximately 6:19 a.m., when he realized that a collision was unavoidable, he stopped the

main engine. The Captain stated that the collision occurred at 6:20 a.m.

A May 6, 1991 Casualty Report submitted to the Kaohsiung Harbor Bureau, largely confirmed Captain Shaw's earlier statement, adding only that, when Captain Shaw left the two deckhands alone on the bridge, the main engine on the bridge was on bridge remote control, and the course was steered by auto pilot.

There were no injuries to the crews of either the PONCHATOULA or the HUI KUO NO. 16 as a result of the collision. Plaintiff-appellant's total damages resulting from the collision, for which it sought some amount of contribution, was $1,200,000.

## DISCUSSION

### I. *Standard of Review*

■ We are confronted at the onset with the government's contention that the only issue before us is whether the district court's conclusion that the United States was not negligent was clearly erroneous. The government recognizes that, under the decisions of this circuit, a district court's finding on the issue of negligence—as distinguished from the evidentiary facts on which the finding is based—is not entitled to the benefit of the "unless clearly erroneous" rule, but instead is reviewed *de novo.* Nonetheless, the government argues that these cases cannot stand in the face of the Supreme Court's decision in *Exxon Co., U.S.A. v. Sofec, Inc.,* ___ U.S. ___, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). We disagree.

We rejected a similar argument over thirty years ago in *Mamiye Bros. v. Barber S.S. Lines, Inc.,* 360 F.2d 774 (2d Cir.1966). In *Mamiye,* we noted that "the only way in which an appellate court can determine whether [the district court] correctly apprehended ... the general standard [for negligence] is by reviewing [its] result, and if that review is to be effective, it must be unimpeded." 360 F.2d at 777. We held that only *de novo* review of a district court's finding of negligence *vel non* would guarantee a uniform body of law on negligence, stating that "uniformity with a circuit or among circuits can be achieved only if appellate review of

the application of a legal standard is free of the shackles of the 'unless clearly erroneous' rule." *Id.* Appellees in *Mamiye* argued that the Supreme Court's decision in *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), compelled us to reevaluate the standard of review of a district court's finding of negligence. We disagreed, noting that the Court's decision in *McAllister* centered on the issue of causation and not negligence. *Mamiye,* 360 F.2d at 777. We stated:

> Finding no discussion in the Supreme Court's opinion directed at what could be considered application of a legal standard to established facts, we adhere to our long-held view that a judge's determination on the issue of negligence does not fall within the "unless clearly erroneous" rule.

*Id.* at 777–78 (footnote omitted).

■ We conclude that *Exxon* has not changed the standard of review of a negligence finding any more than *McAllister* did thirty years earlier. As in *McAllister,* the Court's decision in *Exxon* centered on the issue of causation, not negligence. In *Exxon,* the plaintiff devoted

> a large portion of its briefs to arguing that the findings by the lower courts that [the defendant's] extraordinary negligence was the sole proximate cause of [the plaintiff's] injury were in error. The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review.... A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error.

___ U.S. at ___, 116 S.Ct. at 1819 (internal quotations omitted). Finding nothing in *Exxon* to indicate a change in the standard of review, we adhere to our rule that a district court's finding of negligence is to be reviewed *de novo. Mamiye,* 360 F.2d at 777–78. A district court's finding on issues of causation and on its allocation of fault among negligent parties continues to be subject only to clearly erroneous review, *Getty Oil Co.*

*(E.Operations), Inc. v. SS Ponce De Leon,* 555 F.2d 328, 335 (2d Cir.1977), and so long as the district court's factual findings are supported by the record, we will not overturn them, *Acacia Vera Navigation Co., Ltd. v. Kezia, Ltd.,* 78 F.3d 211, 214, 216 (5th Cir. 1996); however, "[i]f the court applied improper legal standards its conclusion may be corrected as a matter of law," *Interstate Towing Co. v. Stissi,* 717 F.2d 752, 753 (2d Cir.1983).

## II. *COLREGs Violations*

■ "Collision liability is based on fault; the mere fact of impact has no legal consequence." G. Gilmore & C. Black, *The Law of Admiralty* § 7.2, at 486 (2d ed.1975) *quoted in Potomac Transport Inc. v. OMI Corp.,* 741 F.Supp. 395, 401 (S.D.N.Y.1989), *aff'd in part and vacated in part,* 909 F.2d 42 (2d Cir.1990). The parties agree that the International Regulations for Preventing Collisions at Sea, 33 U.S.C. §§ 1602 *et seq.,* as amended (the "COLREGs"), were the rules to be adhered to by both vessels at the time of the collision. Ching Sheng argues that the government violated the COLREGs and that, under *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), the government is liable unless it can show that the statutory violations were not the cause of the collision.

The *Pennsylvania* rule dictates that when a ship

> is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*Id.* at 136. On appeal, Ching Sheng claims that the district court erred by refusing to apply the *Pennsylvania* rule and by rejecting Ching Sheng's claim that the PONCHATOULA's crew violated three statutory provisions. We address each claimed statutory violation in turn.

### A. *COLREG 6—Safe Speed*

■ Ching Sheng first challenges the district court's finding that the PONCHATOULA's crew did not violate COLREG 6 governing safe speeds for vessel travel. COLREG 6 provides:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

> In determining a safe speed the following factors shall be among those taken into account:

> (a) By all vessels:

> (i) The state of visibility;

> (ii) The traffic density including concentrations of fishing vessels or any other vessels;

> (iii) The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

> (iv) At night the presence of background light such as from shore lights or from back scatter of her own lights;

> (v) The state of wind, sea and current, and the proximity of navigational hazards;

> (vi) The draught in relation to the available depth of water.

> (b) Additionally, by vessels with operational radar:

> (i) The characteristics, efficiency and limitations of the radar equipment;

> (ii) Any constraints imposed by the radar range scale in use;

> (iii) The effect on radar detection of the sea state, weather and other sources of interference;

> (iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

> (v) The number, location and movement of vessels detected by radar;

> (vi) The more exact assessment of the visibility that may be possible when radar is

used to determine the range of vessels or other objects in the vicinity.

33 U.S.C. foll. § 1602 (COLREG 6). Ching Sheng argues that the district court erred by failing to take into account (1) the traffic density of the Malacca Strait and (2) PON-CHATOULA's maneuvering limitations. We disagree.

First, we quarrel with Ching Sheng's statement that the district court ignored these two factors. In fact, the district court specifically adverted to them, stating:

> Plaintiff argues that, although visibility was good on the morning that the collision took place, the density of the traffic situation ahead of the PONCHATOULA and the amount of time required to slow or stop the vessel's forward motion indicate that the ship's speed of 18 knots was excessive.

*Ching Sheng Fishery*, 1996 WL 161789, at *12. The district court also specifically referenced Captain Brent's testimony regarding the numerous contacts in front of the PON-CHATOULA that morning and Captain Brent's estimate that it would take up to ten minutes to slow the PONCHATOULA from 115 to 60 RPM. *Id.* at *12.

Second, the district court's finding that the PONCHATOULA's speed was not excessive is supported by the record and not clearly erroneous. The question of what constitutes a "safe speed" is relative to the situation confronting the vessel at any given moment. *See Gele v. Chevron Oil Co.*, 574 F.2d 243, 249 (5th Cir.1978); *see also The George H. Jones*, 27 F.2d 665, 667 (2d Cir.1928) (noting that proper "[s]peed is clearly relative to the situation of the ship"); *Duet v. Delta Marine Drilling Co.*, 215 F.Supp. 898, 900 (E.D.La. 1963) (holding that speed that would have been proper in open sea, was excessive in light of traffic density facing vessel).

On the morning of the collision, the PON-CHATOULA was travelling at 18 knots, its normal transit speed. Visibility was good, and there were light seas and little wind. The PONCHATOULA was forty nautical miles away from One Fathom Bank and thirty nautical miles away from the shore. *Ching Sheng Fishery*, 1996 WL 161789, at *12. Captain Brent testified that there were

no "strange occurrences present," such as a sudden drift of currents, in the area where the PONCHATOULA travelled. The PON-CHATOULA was equipped with two radars with a maximum effective range of twenty-five nautical miles. The PONCHATOULA's maneuverability, while perhaps limited by the circumstances facing it that morning, was not so circumscribed as to prevent it from altering its course to allow the safe passage of both the first and second tankers. At the moment that the PONCHATOULA's 18 knot travelling speed became an issue, Captain Brent ordered it reduced from 115 to 60 RPM. As the district court noted, "[n]othing in the record demonstrates that COLREG 6 required an earlier reduction in speed," *Ching Sheng Fishery*, 1996 WL 161789, at *13, and Ching Sheng points to nothing that would suggest that the timing of Captain Brent's reduction in speed violated COLREG 6. Captain Brent reduced the speed when it became clear that the second tanker unexpectedly signaled its intent to pass on the starboard side of the PONCHATOULA rather than on the port side. We find ample support in the record for the district court's finding that the PONCHATOULA's speed was not excessive under COLREG 6.

### B. COLREG 7—Effective Use of Radar Equipment

■ Ching Sheng next argues that the PONCHATOULA crew's failure to use the vessel's computer-assisted collision avoidance system, the RAYCAS, violated COLREG 7. Appellant's Opening Brief at 24. COLREG 7 provides:

> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

> (b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

(i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change;

(ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

33 U.S.C. foll. § 1602 (COLREG 7). Ching Sheng claims that the rule mandated the use of the RAYCAS to locate the speed, course, and bearing of the HUI KUO NO. 16. We disagree.

■ First, nothing in the language of the statute mandates the exclusive use of a vessel's computer-aided collision avoidance device; instead, the rule is satisfied by either radar plotting *or* "equivalent systematic observation." Moreover, although it has been held that failure to effectively use radar is a statutory violation, *see Trinidad Corp. v. S.S. KEIYOH MARU*, 845 F.2d 818, 826 (9th Cir.1988), there is no support for the broader proposition that only radar plotting or use of a computer-aided collision avoidance system satisfies COLREG 7.

None of the cases cited by Ching Sheng hold otherwise. In fact, most of the cases involve negligent use of radar equipment, *see, e.g., Potomac Transp.*, 741 F.Supp. at 403, 406 (incomplete radar plot and failure to use operational radar violated COLREG 7); *Ocean Foods Boat Co. v. M/V TOSCA*, 692 F.Supp. 1253, 1262–63 (D.Or.1988) (failure to use sea clutter control on radar violated COLREG 7), or involve a watch officer untrained in the proper use of radar equipment, *see, e.g., Elenson v. SS FORTALEZA*, No. 90 Civ. 0437, 1991 WL 254571, at *1, *7–*8 (S.D.N.Y. Nov. 21, 1991) (holding that the watchman violated COLREG 7 when, with visibility hampered by heavy fog, he did no radar plotting and indeed was not trained in the proper use of the radar). Neither situation is present here.

The only two cases which Ching Sheng cites that involve the use of alternative methods of monitoring an approaching vessel are easily distinguishable. In *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 163 (4th Cir.1984), the Fourth Circuit held that an observation technique called "parallel indexing" which determined an oncoming vessel's CPA but not its course, speed, and relative motion was not an "equivalent systematic observation" within the meaning of COLREG 7. And in *G & G Shipping Co., Ltd. v. M/V "NEDLLOYD VAN NOORT"*, 767 F.Supp. 398, 409 (D.P.R.1991), the district court held that failure to use the vessel's collision-avoidance system violated COLREG 7 where the only information about the approaching vessel was gathered through visual observations and an analytical device that revealed only the approaching vessel's CPA.

In contrast, here the methods of monitoring the HUI KUO NO. 16 did reveal course, speed, and relative motion. Gioulis plotted the three vessels on the Raytheon three centimeter radar screen to determine the vessels' course, bearing, and relative motion. In addition, Captain Brent used RAYCAS to designate the HUI KUO NO. 16 until the HUI KUO NO. 16 was no longer visible to the RAYCAS system. At that point, he returned to the use of radar. Captain Brent also used the ship's telescope alidade to take visual bearing of the HUI KUO NO. 16 and the second tanker. There was no evidence that the combined use of radar, plotting, alidade, and the RAYCAS was not an "equivalent systematic observation" method under COLREG 7. In short, unlike the methods employed in *Hellenic Lines* and *G & G*, the methods used by the PONCHATOULA's crew revealed relative motion, course, and speed of the HUI KUO NO. 16. Therefore, it was not clearly erroneous for the district court to conclude that COLREG 7 was not violated by the PONCHATOULA's personnel.

C. *COLREG 8—Action to Avoid Collision*

■ Ching Sheng's final claim is that the crew of the PONCHATOULA violated COLREG 8 by failing to take timely evasive

action to avoid collision. COLREG 8 provides in relevant part:

(a) Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

33 U.S.C. foll. § 1602 (COLREG 8).

Ching Sheng first claims that Captain Brent's ordered reduction in speed from 115 to 60 RPM was "too little too late" because Captain Brent knew that the speed reduction could not be accomplished in less than ten minutes. Although apparently conceding that Captain Brent's actions were "substantial," Ching Sheng claims that the PONCHATOULA's maneuvers were simply too late to satisfy COLREG 8. Appellant's Opening Brief 31, 35. As our discussion of COLREG 6 indicates, nothing required an earlier reduction in speed. There is no indication in the record that earlier maneuvering to avoid collision was required. We therefore reject Ching Sheng's claim.

■ Ching Sheng also contends that the "special circumstances" presented prior to the collision required that a port side turn be effected, Appellant's Opening Brief 32, even though, under normal circumstances, vessels on a collision course are required by COLREG 14 to turn toward starboard and effect a portside-to-portside pass. 33 U.S.C. foll. § 1692 (COLREG 14) ("When two ... vessels are meeting on reciprocal or nearly reciprocal courses so as to involve the risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other."). COLREG 2 provides, in relevant part, that "[n]othing in these [COLREGs] shall exonerate any vessel, or the owner, master or crew thereof, from the consequences ... of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 U.S.C. foll. § 1692 (COLREG 2).

Citing to *Makin v. Empresa Lineas Maritimas Argentinas,* 630 F.Supp. 1168 (D.Mass. 1986), Ching Sheng claims that the presence of the second tanker hindered the ability of the PONCHATOULA to turn toward starboard as required by COLREG 14, creating a "special circumstance" which would allow, under COLREG 2, the PONCHATOULA to depart from COLREG 14's command and turn instead toward port. We disagree. First, we note that nothing in *Makin* compels the conclusion that the presence of the second tanker made this situation a *per se* "special circumstance" under COLREG 2, permitting departure from the mandates of COLREG 14. Second, even if the presence of the second tanker was a special circumstance excusing adherence to COLREG 14, a starboard turn would still be appropriate if it could be accomplished, especially in light of the fact that Captain Brent could reasonably expect that the HUI KUO NO. 16 would turn starboard in compliance with COLREG 14. Third, a countervailing "special circumstance" was present which prevented Captain Brent from turning toward port. Specifically, from the bridge of the PONCHATOULA, it appeared that the HUI KUO NO. 16 was actually turning starboard, as it would be expected to do under COLREGs 14 and 8. Under these circumstances, it was not a violation of COLREG 8 for Captain Brent to turn toward starboard in compliance with COLREG 14.

■ Finally, we address Ching Sheng's claim that the PONCHATOULA crew's failure to "know where the ship is" is a basis for liability. First, nothing in the rules required the PONCHATOULA to conduct a "fix" at a greater frequency than it did. Second, even if Captain Brent's decision not to turn to port was, in part, colored by imprecise information as to the PONCHATOULA's location, Ching Sheng has not demonstrated that Brent's decision would have been different had a navigational fix been taken closer to the time of the collision. Instead, there was evidence that, in addition to Captain Brent's doubt as to the location of his vessel, his decision to turn to starboard was also the result of his required adherence to COLREG 14 and the fact that the HUI KUO NO. 16 was indicating that it would pass on the PONCHATOULA's port side in compliance with COLREG 14. In light of this evidence, we cannot find clearly erroneous the district court's finding that Captain Brent's decision

to turn to starboard did not violate COLREG 8.

Having concluded that the district court's finding that the PONCHATOULA did not violate the COLREGs is not clearly erroneous, we need not apply the *Pennsylvania* rule and, after our *de novo* review of the record, we affirm the district court's holding that the United States was not negligent and therefore not liable for damages from the collision.

## CONCLUSION

Based on the foregoing, we affirm the decision of the district court relieving the United States of liability for damage caused to plaintiff-appellant's vessel, the HUI KUO NO. 16, as a result of its collision with the USNS PONCHATOULA.